532 U.S. 223
121 S.Ct. 1475
149 L.Ed.2d 420
 NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.
JAMES ALEXANDER, DIRECTOR, ALABAMA DEPARTMENT OF PUBLIC SAFETY, et al., PETITIONERS
v.
MARTHA SANDOVAL, individually and on behalf of all others similarly situated
 No. 99-1908.
 SUPREME COURT OF THE UNITED STATES
 Argued January 16, 2001
 Decided April 24, 2001
 
 Syllabus
 As a recipient of federal financial assistance, the Alabama Department of Public Safety (Department), of which petitioner Alexander is the Director, is subject to Title VI of the Civil Rights Act of 1964. Section 601 of that Title prohibits discrimination based on race, color, or national origin in covered programs and activities. Section 602 authorizes federal agencies to effectuate 601 by issuing regulations, and the Department of Justice (DOJ) in an exercise of this authority promulgated a regulation forbidding funding recipients to utilize criteria or administrative methods having the effect of subjecting individuals to discrimination based on the prohibited grounds. Respondent Sandoval brought this class action to enjoin the Department's decision to administer state driver's license examinations only in English, arguing that it violated the DOJ regulation because it had the effect of subjecting non-English speakers to discrimination based on their national origin. Agreeing, the District Court enjoined the policy and ordered the Department to accommodate non-English speakers. The Eleventh Circuit affirmed. Both courts rejected petitioners' argument that Title VI did not provide respondents a cause of action to enforce the regulation.
 Held: There is no private right of action to enforce disparate-impact regulations promulgated under Title VI. Pp. 3-17.
 (a) Three aspects of Title VI must be taken as given. First, private individuals may sue to enforce 601. See, e.g., Cannon v. University of Chicago, 441 U.S. 677, 694, 696, 699, 703, 710-711. Second, 601 prohibits only intentional discrimination. See, e.g., Alexander v. Choate, 469 U.S. 287, 293. Third, it must be assumed for purposes of deciding this case that regulations promulgated under 602 may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under 601. Pp. 3-5.
 (b) This Court has not, however, held that Title VI disparate-impact regulations may be enforced through a private right of action. Cannon was decided on the assumption that the respondent there had intentionally discriminated against the petitioner, see 441 U.S., at 680. In Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582, the Court held that private individuals could not recover compensatory damages under Title VI except for intentional discrimination. Of the five Justices who also voted to uphold disparate-impact regulations, three expressly reserved the question of a direct private right of action to enforce them, 463 U.S., at 645, n. 18. Pp. 5-7.
 (c) Nor does it follow from the three points taken as given that Congress must have intended such a private right of action. There is no doubt that regulations applying 601's ban on intentional discrimination are covered by the cause of action to enforce that section. But the disparate-impact regulations do not simply apply 601-since they forbid conduct that 601 permits-and thus the private right of action to enforce 601 does not include a private right to enforce these regulations. See Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164, 173. That right must come, if at all, from the independent force of 602. Pp. 7-10.
 (d) Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. Touche Ross & Co. v. Redington, 442 U.S. 560, 578. This Court will not revert to the understanding of private causes of action, represented by J. I. Case Co. v. Borak, 377 U.S. 426, 433, that held sway when Title VI was enacted. That understanding was abandoned in Cort v. Ash, 422 U.S. 66, 78. Nor does the Court agree with the Government's contention that cases interpreting statutes enacted prior to Cort v. Ash have given dispositive weight to the expectations that the enacting Congress had formed in light of the contemporary legal context. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 378-379; Cannon, supra, at 698-699; and Thompson v. Thompson, 484 U.S. 174, distinguished. Pp. 10-12.
 (e) The search for Congress's intent in this case begins and ends with Title VI's text and structure. The "rights-creating" language so critical to Cannon's 601 analysis, 441 U.S., at 690, n. 13, is completely absent from 602. Whereas 601 decrees that "[n]o person ... shall ... be subjected to discrimination," 602 limits federal agencies to "effectuat[ing]" rights created by 601. And 602 focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the regulating agencies. Hence, there is far less reason to infer a private remedy in favor of individual persons, Cannon, supra, at 690-691. The methods 602 expressly provides for enforcing its regulations, which place elaborate restrictions on agency enforcement, also suggest a congressional intent not to create a private remedy through 602. See, e.g., Karahalios v. Federal Employees, 489 U.S. 527, 533. Pp. 12-15.
 (f) The Court rejects arguments that the regulations at issue contain rights-creating language and so must be privately enforceable; that amendments to Title VI in 1003 of the Rehabilitation Act Amendments of 1986 and 6 of the Civil Rights Restoration Act of 1987 "ratified" decisions finding an implied private right of action to enforce the regulations; and that the congressional intent to create a right of action must be inferred under Curran, supra, at 353, 381-382. Pp. 15-17.
 197 F.3d 484, reversed.
 Scalia, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Kennedy, and Thomas, JJ., joined. Stevens, J., filed a dissenting opinion, in which Souter, Ginsburg, and Breyer, JJ., joined.
 Opinion of the Court
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
 Justice Scalia delivered the opinion of the Court.
 
 
 1
 This case presents the question whether private individuals may sue to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964.
 
 
 2
 * The Alabama Department of Public Safety (Department), of which petitioner James Alexander is the Director, accepted grants of financial assistance from the United States Department of Justice (DOJ) and Department of Transportation (DOT) and so subjected itself to the restrictions of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. 2000d et seq. Section 601 of that Title provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. 2000d. Section 602 authorizes federal agencies "to effectuate the provisions of [601] ... by issuing rules, regulations, or orders of general applicability," 42 U.S.C. 2000d-1, and the DOJ in an exercise of this authority promulgated a regulation forbidding funding recipients to "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin ... ." 28 CFR 42.104(b)(2) (1999). See also 49 CFR 21.5(b)(2) (2000) (similar DOT regulation).
 
 
 3
 The State of Alabama amended its Constitution in 1990 to declare English "the official language of the state of Alabama." Amdt. 509. Pursuant to this provision and, petitioners have argued, to advance public safety, the Department decided to administer state driver's license examinations only in English. Respondent Sandoval, as representative of a class, brought suit in the United States District Court for the Middle District of Alabama to enjoin the English-only policy, arguing that it violated the DOJ regulation because it had the effect of subjecting non-English speakers to discrimination based on their national origin. The District Court agreed. It enjoined the policy and ordered the Department to accommodate non-English speakers. Sandoval v. Hagan, 7 F. Supp. 2d 1234 (1998). Petitioners appealed to the Court of Appeals for the Eleventh Circuit, which affirmed. Sandoval v. Hagan, 197 F.3d 484 (1999). Both courts rejected petitioners' argument that Title VI did not provide respondents a cause of action to enforce the regulation.
 
 
 4
 We do not inquire here whether the DOJ regulation was authorized by 602, or whether the courts below were correct to hold that the English-only policy had the effect of discriminating on the basis of national origin. The petition for writ of certiorari raised, and we agreed to review, only the question posed in the first paragraph of this opinion: whether there is a private cause of action to enforce the regulation. 530 U.S. 1305 (2000).
 
 II
 
 5
 Although Title VI has often come to this Court, it is fair to say (indeed, perhaps an understatement) that our opinions have not eliminated all uncertainty regarding its commands. For purposes of the present case, however, it is clear from our decisions, from Congress's amendments of Title VI, and from the parties' concessions that three aspects of Title VI must be taken as given. First, private individuals may sue to enforce 601 of Title VI and obtain both injunctive relief and damages. In Cannon v. University of Chicago, 441 U.S. 677 (1979), the Court held that a private right of action existed to enforce Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. 1681 et seq. The reasoning of that decision embraced the existence of a private right to enforce Title VI as well. "Title IX," the Court noted, "was patterned after Title VI of the Civil Rights Act of 1964." 441 U.S., at 694. And, "[i]n 1972 when Title IX was enacted, the [parallel] language in Title VI had already been construed as creating a private remedy." Id., at 696. That meant, the Court reasoned, that Congress had intended Title IX, like Title VI, to provide a private cause of action. Id., at 699, 703, 710-711. Congress has since ratified Cannon's holding. Section 1003 of the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. 2000d-7, expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI and provided that in a suit against a State "remedies (including remedies both at law and in equity) are available ... to the same extent as such remedies are available ... in the suit against any public or private entity other than a State," 2000d-7(a)(2). We recognized in Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), that 2000d-7 "cannot be read except as a validation of Cannon's holding." Id., at 72; see also id., at 78 (Scalia, J., concurring in judgment) (same). It is thus beyond dispute that private individuals may sue to enforce 601.
 
 
 6
 Second, it is similarly beyond dispute-and no party disagrees-that 601 prohibits only intentional discrimination. In Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978), the Court reviewed a decision of the California Supreme Court that had enjoined the University of California Medical School from "according any consideration to race in its admissions process." Id., at 272. Essential to the Court's holding reversing that aspect of the California court's decision was the determination that 601 "proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." Id., at 287 (opinion of Powell, J.); see also id., at 325, 328, 352 (opinion of Brennan, White, Marshall, and Blackmun, JJ.). In Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983), the Court made clear that under Bakke only intentional discrimination was forbidden by 601. 463 U.S., at 610-611 (Powell, J., joined by Burger, C. J., and Rehnquist, J., concurring in judgment); id., at 612 (O'Connor, J., concurring in judgment); id., at 642 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). What we said in Alexander v. Choate, 469 U.S. 287, 293 (1985), is true today: "Title VI itself directly reach[es] only instances of intentional discrimination."[1]
 
 
 7
 Third, we must assume for purposes of deciding this case that regulations promulgated under 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under 601. Though no opinion of this Court has held that, five Justices in Guardians voiced that view of the law at least as alternative grounds for their decisions, see 463 U.S., at 591-592 (opinion of White, J.); id., at 623, n. 15 (Marshall, J., dissenting); id., at 643-645 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting), and dictum in Alexander v. Choate is to the same effect, see 469 U.S., at 293, 295, n. 11. These statements are in considerable tension with the rule of Bakke and Guardians that 601 forbids only intentional discrimination, see, e.g., Guardians Assn. v. Civil Serv. Comm'n of New York City, supra, at 612-613 (O'Connor, J., concurring in judgment), but petitioners have not challenged the regulations here. We therefore assume for the purposes of deciding this case that the DOJ and DOT regulations proscribing activities that have a disparate impact on the basis of race are valid.
 
 
 8
 Respondents assert that the issue in this case, like the first two described above, has been resolved by our cases. To reject a private cause of action to enforce the disparate-impact regulations, they say, we would "[have] to ignore the actual language of Guardians and Cannon." Brief for Respondents 13. The language in Cannon to which respondents refer does not in fact support their position, as we shall discuss at length below, see infra, at 12-13. But in any event, this Court is bound by holdings, not language. Cannon was decided on the assumption that the University of Chicago had intentionally discriminated against petitioner. See 441 U.S., at 680 (noting that respondents "admitted arguendo" that petitioner's "application for admission to medical school was denied by the respondents because she is a woman"). It therefore held that Title IX created a private right of action to enforce its ban on intentional discrimination, but had no occasion to consider whether the right reached regulations barring disparate-impact discrimination.[2] In Guardians, the Court held that private individuals could not recover compensatory damages under Title VI except for intentional discrimination. Five Justices in addition voted to uphold the disparate-impact regulations (four would have declared them invalid, see 463 U.S., at 611, n. 5 (Powell, J., concurring in judgment); id., at 612-614 (O'Connor, J., concurring in judgment)), but of those five, three expressly reserved the question of a direct private right of action to enforce the regulations, saying that "[w]hether a cause of action against private parties exists directly under the regulations ... [is a] questio[n] that [is] not presented by this case." Id., at 645, n. 18 (Stevens, J., dissenting).[3] Thus, only two Justices had cause to reach the issue that respondents say the "actual language" of Guardians resolves. Neither that case,[4] nor any other in this Court, has held that the private right of action exists.
 
 
 9
 Nor does it follow straightaway from the three points we have taken as given that Congress must have intended a private right of action to enforce disparate-impact regulations. We do not doubt that regulations applying 601's ban on intentional discrimination are covered by the cause of action to enforce that section. Such regulations, if valid and reasonable, authoritatively construe the statute itself, see NationsBank of N. C., N. A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995); Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-844 (1984), and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well. The many cases that respondents say have "assumed" that a cause of action to enforce a statute includes one to enforce its regulations illustrate (to the extent that cases in which an issue was not presented can illustrate anything) only this point; each involved regulations of the type we have just described, as respondents conceded at oral argument, Tr. of Oral Arg. 33. See National Collegiate Athletic Assn. v. Smith, 525 U.S. 459, 468 (1999) (regulation defining who is a "recipient" under Title IX); School Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 279-281 (1987) (regulations defining the terms "physical impairment" and "major life activities" in 504 of the Rehabilitation Act of 1973); Bazemore v. Friday, 478 U.S. 385, 408-409 (1986) (White, J., joined by four other Justices, concurring) (regulation interpreting Title VI to require "affirmative action" remedying effects of intentional discrimination); Alexander v. Choate, 469 U.S., at 299, 309 (regulations clarifying what sorts of disparate impacts upon the handicapped were covered by 504 of the Rehabilitation Act of 1973, which the Court assumed included some such impacts). Our decision in Lau v. Nichols, 414 U.S. 563 (1974), falls within the same category. The Title VI regulations at issue in Lau, similar to the ones at issue here, forbade funding recipients to take actions which had the effect of discriminating on the basis of race, color, or national origin. Id., at 568. Unlike our later cases, however, the Court in Lau interpreted 601 itself to proscribe disparate-impact discrimination, saying that it "rel[ied] solely on 601 ... to reverse the Court of Appeals," id., at 566, and that the disparate-impact regulations simply "[made] sure that recipients of federal aid ... conduct[ed] any federally financed projects consistently with 601," id., at 567.[5]
 
 
 10
 We must face now the question avoided by Lau, because we have since rejected Lau's interpretation of 601 as reaching beyond intentional discrimination. See supra, at 4. It is clear now that the disparate-impact regulations do not simply apply 601-since they indeed forbid conduct that 601 permits-and therefore clear that the private right of action to enforce 601 does not include a private right to enforce these regulations. See Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164, 173 (1994) (a "private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]"). That right must come, if at all, from the independent force of 602. As stated earlier, we assume for purposes of this decision that 602 confers the authority to promulgate disparate-impact regulations[6]; the question remains whether it confers a private right of action to enforce them. If not, we must conclude that a failure to comply with regulations promulgated under 602 that is not also a failure to comply with 601 is not actionable.
 
 
 11
 Implicit in our discussion thus far has been a particular understanding of the genesis of private causes of action. Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979) (remedies available are those "that Congress enacted into law"). The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15 (1979). Statutory intent on this latter point is determinative. See, e.g., Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1102 (1991); Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 812, n. 9 (1986) (collecting cases). Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 145, 148 (1985); Transamerica Mortgage Advisors, Inc. v. Lewis, supra, at 23; Touche Ross & Co. v. Redington, supra, at 575-576. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 365 (1991) (Scalia, J., concurring in part and concurring in judgment).
 
 
 12
 Respondents would have us revert in this case to the understanding of private causes of action that held sway 40 years ago when Title VI was enacted. That understanding is captured by the Court's statement in J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964), that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute. We abandoned that understanding in Cort v. Ash, 422 U.S. 66, 78 (1975)-which itself interpreted a statute enacted under the ancien regime-and have not returned to it since. Not even when interpreting the same Securities Exchange Act of 1934 that was at issue in Borak have we applied Borak's method for discerning and defining causes of action. See Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., supra, at 188; Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 291-293 (1993); Virginia Bankshares, Inc. v. Sandberg, supra, at 1102-1103; Touche Ross & Co. v. Redington, supra, at 576-578. Having sworn off the habit of venturing beyond Congress's intent, we will not accept respondents' invitation to have one last drink.
 
 
 13
 Nor do we agree with the Government that our cases interpreting statutes enacted prior to Cort v. Ash have given "dispositive weight" to the "expectations" that the enacting Congress had formed "in light of the 'contemporary legal context.' " Brief for United States 14. Only three of our legion implied-right-of-action cases have found this sort of "contemporary legal context" relevant, and two of those involved Congress's enactment (or reenactment) of the verbatim statutory text that courts had previously interpreted to create a private right of action. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 378-379 (1982); Cannon v. University of Chicago, 441 U.S., at 698-699. In the third case, this sort of "contemporary legal context" simply buttressed a conclusion independently supported by the text of the statute. See Thompson v. Thompson, 484 U.S. 174 (1988). We have never accorded dispositive weight to context shorn of text. In determining whether statutes create private rights of action, as in interpreting statutes generally, see Blatchford v. Native Village of Noatak, 501 U.S. 775, 784 (1991), legal context matters only to the extent it clarifies text.
 
 
 14
 We therefore begin (and find that we can end) our search for Congress's intent with the text and structure of Title VI.[7] Section 602 authorizes federal agencies "to effectuate the provisions of [601] ... by issuing rules, regulations, or orders of general applicability." 42 U.S.C. 2000d-1. It is immediately clear that the "rights-creating" language so critical to the Court's analysis in Cannon of 601, see 441 U.S., at 690 n. 13, is completely absent from 602. Whereas 601 decrees that "[n]o person ... shall ... be subjected to discrimination," 42 U.S.C. 2000d the text of 602 provides that "[e]ach Federal department and agency ... is authorized and directed to effectuate the provisions of [601]," 42 U.S.C. 2000d-1. Far from displaying congressional intent to create new rights, 602 limits agencies to "effectuat[ing]" rights already created by 601. And the focus of 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection. Statutes that focus on the person regulated rather than the individuals protected create "no implication of an intent to confer rights on a particular class of persons." California v. Sierra Club, 451 U.S. 287, 294 (1981). Section 602 is yet a step further removed: it focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating. Like the statute found not to create a right of action in Universities Research Assn., Inc. v. Coutu, 450 U.S. 754 (1981), 602 is "phrased as a directive to federal agencies engaged in the distribution of public funds," id., at 772. When this is true, "[t]here [is] far less reason to infer a private remedy in favor of individual persons," Cannon v. University of Chicago, supra, at 690-691. So far as we can tell, this authorizing portion of 602 reveals no congressional intent to create a private right of action.
 
 
 15
 Nor do the methods that 602 goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite. Section 602 empowers agencies to enforce their regulations either by terminating funding to the "particular program, or part thereof," that has violated the regulation or "by any other means authorized by law," 42 U.S.C. 2000d-1. No enforcement action may be taken, however, "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." Ibid. And every agency enforcement action is subject to judicial review. 2000d-2. If an agency attempts to terminate program funding, still more restrictions apply. The agency head must "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." 2000d-1. And the termination of funding does not "become effective until thirty days have elapsed after the filing of such report." Ibid. Whatever these elaborate restrictions on agency enforcement may imply for the private enforcement of rights created outside of 602, compare Cannon v. University of Chicago, supra, at 706, n. 41, 712, n. 49; Regents of Univ. of Cal. v. Bakke, 438 U.S., at 419, n. 26 (Stevens, J., concurring in judgment in part and dissenting in part), with Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S., at 609-610 (Powell, J., concurring in judgment); Regents of Univ. of Cal. v. Bakke, supra, at 382-383 (opinion of White, J.), they tend to contradict a congressional intent to create privately enforceable rights through 602 itself. The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others. See, e.g., Karahalios v. Federal Employees, 489 U.S. 527, 533 (1989); Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 93-94 (1981); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S., at 19-20. Sometimes the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff "a member of the class for whose benefit the statute was enacted") suggest the contrary. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S., at 145; see id., at 146-147. And as our Rev. Stat. 1979, 42 U.S.C. 1983 cases show, some remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights. See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Assn., 453 U.S. 1, 19-20 (1981). In the present case, the claim of exclusivity for the express remedial scheme does not even have to overcome such obstacles. The question whether 602's remedial scheme can overbear other evidence of congressional intent is simply not presented, since we have found no evidence anywhere in the text to suggest that Congress intended to create a private right to enforce regulations promulgated under 602.
 
 
 16
 Both the Government and respondents argue that the regulations contain rights-creating language and so must be privately enforceable, see Brief for United States 19-20; Brief for Respondents 31, but that argument skips an analytical step. Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Touche Ross & Co. v. Redington, 442 U.S., at 577, n. 18 ("[T]he language of the statute and not the rules must control"). Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.
 
 
 17
 The last string to respondents' and the Government's bow is their argument that two amendments to Title VI "ratified" this Court's decisions finding an implied private right of action to enforce the disparate-impact regulations. See Rehabilitation Act Amendments of 1986, 1003, 42 U.S.C. 2000d-7; Civil Rights Restoration Act of 1987, 6, 102 Stat. 31, 42 U.S.C. 2000d-4a. One problem with this argument is that, as explained above, none of our decisions establishes (or even assumes) the private right of action at issue here, see supra, at 5-8, which is why in Guardians three Justices were able expressly to reserve the question. See 463 U.S., at 645, n. 18 (Stevens, J., dissenting). Incorporating our cases in the amendments would thus not help respondents. Another problem is that the incorporation claim itself is flawed. Section 1003 of the Rehabilitation Act Amendments of 1986, on which only respondents rely, by its terms applies only to suits "for a violation of a statute," 42 U.S.C. 2000d-7(a)(2) (emphasis added). It therefore does not speak to suits for violations of regulations that go beyond the statutory proscription of 601. Section 6 of the Civil Rights Restoration Act of 1987 is even less on point. That provision amends Title VI to make the term "program or activity" cover larger portions of the institutions receiving federal financial aid than it had previously covered, see Grove City College v. Bell, 465 U.S. 555 (1984). It is impossible to understand what this has to do with implied causes of action-which is why we declared in Franklin v. Gwinnett County Public Schools, 503 U.S., at 73, that 6 did not "in any way alte[r] the existing rights of action and the corresponding remedies permissible under ... Title VI." Respondents point to Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S., at 381-382, which inferred congressional intent to ratify lower court decisions regarding a particular statutory provision when Congress comprehensively revised the statutory scheme but did not amend that provision. But we recently criticized Curran's reliance on congressional inaction, saying that "[a]s a general matter ... [the] argumen[t] deserve[s] little weight in the interpretive process." Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S., at 187. And when, as here, Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, we have spoken more bluntly: "It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the Court's statutory interpretation." Patterson v. McLean Credit Union, 491 U.S. 164, 175, n. 1 (1989) (quoting Johnson v. Transportation Agency, Santa Clara Cty., 480 U.S. 616, 671-672 (1987) (Scalia, J., dissenting)).
 
 
 18
 Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under 602.[8] We therefore hold that no such right of action exists. Since we reach this conclusion applying our standard test for discerning private causes of action, we do not address petitioners' additional argument that implied causes of action against States (and perhaps nonfederal state actors generally) are inconsistent with the clear statement rule of Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 (1981). See Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 656-657, 684-685 (1999) (Kennedy, J., dissenting).
 
 
 19
 The judgment of the Court of Appeals is reversed.
 
 
 20
 It is so ordered.
 
 
 
 NOTES:
 
 
 [1]
 Since the parties do not dispute this point, it is puzzling to see Justice Stevens go out of his way to disparage the decisions in Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978), and Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983), as "somewhat haphazard," post, at 16, particularly since he had already accorded stare decisis effect to the former 18 years ago, see Guardians, 463 U.S., at 639-642 (dissenting opinion), and since he participated in creating the latter, see ibid. Nor does Justice Stevens' reliance on Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), see post, at 17-18, explain his aboutface, since he expressly reaffirms, see post, at 17-18, n. 18, the settled principle that decisions of this Court declaring the meaning of statutes prior to Chevron need not be reconsidered after Chevron in light of agency regulations that were already in force when our decisions were issued, Lechmere, Inc. v. NLRB, 502 U.S. 527, 536-537 (1992); Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 131 (1990); see also Sullivan v. Everhart, 494 U.S. 83, 103-104, n. 6 (1990) (Stevens, J., dissenting) ("It is, of course, of no importance that [an opinion] predates Chevron ... . As we made clear in Chevron, the interpretive maxims summarized therein were 'well-settled principles' ").
 
 
 [2]
 Although the dissent acknowledges that "the breadth of [Cannon's] precedent is a matter upon which reasonable jurists may differ," post, at 21, it disagrees with our reading of Cannon's holding because it thinks the distinction we draw between disparate-impact and intentional discrimination was "wholly foreign" to that opinion, see post, at 5. Cannon, however, was decided less than one year after the Court in Bakke had drawn precisely that distinction with respect to Title VI, see supra, at 4, and it is absurd to think that Cannon meant, without discussion, to ban under Title IX the very disparate-impact discrimination that Bakke said Title VI permitted. The only discussion in Cannon of Title IX's scope is found in Justice Powell's dissenting opinion, which simply assumed that the conclusion that Title IX would be limited to intentional discrimination was "forgone in light of our holding" in Bakke. Cannon v. University of Chicago, 441 U.S. 677, 748, n. 19 (1979). The dissent's additional claim that Cannon provided a private right of action for "all the discrimination prohibited by the regulatory scheme contained in Title IX," post, at 5, n. 4 (emphasis added), simply begs the question at the heart of this case, which is whether a right of action to enforce disparate-impact regulations must be independently identified, see infra, at 7-10.
 
 
 [3]
 We of course accept the statement by the author of the dissent that he "thought" at the time of Guardians that disparate-impact regulations could be enforced "in an implied action against private parties," post, at 9, n. 6. But we have the better interpretation of what our colleague wrote in Guardians. In the closing section of his opinion, Justice Stevens concluded that because respondents in that case had "violated the petitioners' rights under [the] regulations ... [t]he petitioners were therefore entitled to the compensation they sought under 42 U.S.C. 1983 and were awarded by the District Court." 463 U.S., at 645. The passage omits any mention of a direct private right of action to enforce the regulations, and the footnote we have quoted in text-which appears immediately after this concluding sentence, see id., at 645, n. 18-makes clear that the omission was not accidental.
 
 
 [4]
 Ultimately, the dissent agrees that "the holding in Guardians does not compel the conclusion that a private right of action exists to enforce the Title VI regulations against private parties ... ." Post, at 9.
 
 
 [5]
 It is true, as the dissent points out, see post, at 3-4, that three Justices who concurred in the result in Lau relied on regulations promulgated under 602 to support their position, see Lau v. Nichols, 414 U.S. 563, 570-571 (1974) (Stewart, J., concurring in result). But the five Justices who made up the majority did not, and their holding is not made coextensive with the concurrence because their opinion does not expressly preclude (is "consistent with," see post, at 4) the concurrence's approach. The Court would be in an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of Justice Stevens' new principle that silence implies agreement.
 
 
 [6]
 For this reason, the dissent's extended discussion of the scope of agencies' regulatory authority under 602, see post, at 13-15, is beside the point. We cannot help observing, however, how strange it is to say that disparate-impact regulations are "inspired by, at the service of, and inseparably intertwined with" 601, post, at 15, when 601 permits the very behavior that the regulations forbid. See Guardians, 463 U.S., at 613 (O'Connor, J., concurring in judgment) ("If, as five members of the Court concluded in Bakke, the purpose of Title VI is to proscribe only purposeful discrimination ... , regulations that would proscribe conduct by the recipient having only a discriminatory effect ... do not simply 'further' the purpose of Title VI; they go well beyond that purpose").
 
 
 [7]
 Although the dissent claims that we "adop[t] a methodology that blinds itself to important evidence of congressional intent," see post, at 21, our methodology is not novel, but well established in earlier decisions (including one authored by Justice Stevens, see Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94, n. 31 (1981)), which explain that the interpretive inquiry begins with the text and structure of the statute, see id., at 91, and ends once it has become clear that Congress did not provide a cause of action.
 
 
 [8]
 The dissent complains that we "offe[r] little affirmative support" for this conclusion. Post, at 24. But as Justice Stevens has previously recognized in an opinion for the Court, "affirmative" evidence of congressional intent must be provided for an implied remedy, not against it, for without such intent "the essential predicate for implication of a private remedy simply does not exist," Northwest Airlines, Inc., 451 U.S., at 94. The dissent's assertion that "petitioners have marshaled substantial affirmative evidence that a private right of action exists to enforce Title VI and the regulations validly promulgated thereunder," post, at 24-25, n. 26 (second emphasis added), once again begs the question whether authorization of a private right of action to enforce a statute constitutes authorization of a private right of action to enforce regulations that go beyond what the statute itself requires.
 
 
 Stevens, J., dissenting
 
 21
 Justice Stevens, with whom Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting.
 
 
 22
 In 1964, as part of a groundbreaking and comprehensive civil rights Act, Congress prohibited recipients of federal funds from discriminating on the basis of race, ethnicity, or national origin. Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. 2000d to 2000d-7. Pursuant to powers expressly delegated by that Act, the federal agencies and departments responsible for awarding and administering federal contracts immediately adopted regulations prohibiting federal contractees from adopting policies that have the "effect" of discriminating on those bases. At the time of the promulgation of these regulations, prevailing principles of statutory construction assumed that Congress intended a private right of action whenever such a cause of action was necessary to protect individual rights granted by valid federal law. Relying both on this presumption and on independent analysis of Title VI, this Court has repeatedly and consistently affirmed the right of private individuals to bring civil suits to enforce rights guaranteed by Title VI. A fair reading of those cases, and coherent implementation of the statutory scheme, requires the same result under Title VI's implementing regulations.
 
 
 23
 In separate lawsuits spanning several decades, we have endorsed an action identical in substance to the one brought in this case, see Lau v. Nichols, 414 U.S. 563 (1974); demonstrated that Congress intended a private right of action to protect the rights guaranteed by Title VI, see Cannon v. University of Chicago, 441 U.S. 677 (1979); and concluded that private individuals may seek declaratory and injunctive relief against state officials for violations of regulations promulgated pursuant to Title VI, see Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983). Giving fair import to our language and our holdings, every Court of Appeals to address the question has concluded that a private right of action exists to enforce the rights guaranteed both by the text of Title VI and by any regulations validly promulgated pursuant to that Title, and Congress has adopted several statutes that appear to ratify the status quo.
 
 
 24
 Today, in a decision unfounded in our precedent and hostile to decades of settled expectations, a majority of this Court carves out an important exception to the right of private action long recognized under Title VI. In so doing, the Court makes three distinct, albeit interrelated, errors. First, the Court provides a muddled account of both the reasoning and the breadth of our prior decisions endorsing a private right of action under Title VI, thereby obscuring the conflict between those opinions and today's decision. Second, the Court offers a flawed and unconvincing analysis of the relationship between 601 and 602 of the Civil Rights Act of 1964, ignoring more plausible and persuasive explanations detailed in our prior opinions. Finally, the Court badly misconstrues the theoretical linchpin of our decision in Cannon v. University of Chicago, 441 U.S. 677 (1979), mistaking that decision's careful contextual analysis for judicial fiat.
 
 
 25
 * The majority is undoubtedly correct that this Court has never said in so many words that a private right of action exists to enforce the disparate-impact regulations promulgated under 602. However, the failure of our cases to state this conclusion explicitly does not absolve the Court of the responsibility to canvass our prior opinions for guidance. Reviewing these opinions with the care they deserve, I reach the same conclusion as the Courts of Appeals: This Court has already considered the question presented today and concluded that a private right of action exists.[1]
 
 
 26
 When this Court faced an identical case 27 years ago, all the Justices believed that private parties could bring lawsuits under Title VI and its implementing regulations to enjoin the provision of governmental services in a manner that discriminated against non-English speakers. See Lau v. Nichols, 414 U.S. 563 (1974). While five Justices saw no need to go beyond the command of 601, Chief Justice Burger, Justice Stewart, and Justice Blackmun relied specifically and exclusively on the regulations to support the private action, see id., at 569 (Stewart, J., concurring in result) (citing Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369 (1973); Thorpe v. Housing Authority of Durham, 393 U.S. 268, 280-281 (1969)). There is nothing in the majority's opinion in Lau, or in earlier opinions of the Court, that is not fully consistent with the analysis of the concurring Justices or that would have differentiated between private actions to enforce the text of 601 and private actions to enforce the regulations promulgated pursuant to 602. See Guardians, 463 U.S., at 591 (principal opinion of White, J.) (describing this history and noting that, up to that point, no Justice had ever expressed disagreement with Justice Stewart's analysis in Lau).[2]
 
 
 27
 Five years later, we more explicitly considered whether a private right of action exists to enforce the guarantees of Title VI and its gender-based twin, Title IX. See Cannon v. University of Chicago, 441 U.S. 677 (1979). In that case, we examined the text of the statutes, analyzed the purpose of the laws, and canvassed the relevant legislative history. Our conclusion was unequivocal: "We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination." Id., at 703.
 
 
 28
 The majority acknowledges that Cannon is binding precedent with regard to both Title VI and Title IX, ante, at 3-4, but seeks to limit the scope of its holding to cases involving allegations of intentional discrimination. The distinction the majority attempts to impose is wholly foreign to Cannon's text and reasoning. The opinion in Cannon consistently treats the question presented in that case as whether a private right of action exists to enforce "Title IX" (and by extension "Title VI"),[3] and does not draw any distinctions between the various types of discrimination outlawed by the operation of those statutes. Though the opinion did not reach out to affirmatively preclude the drawing of every conceivable distinction, it could hardly have been more clear as to the scope of its holding: A private right of action exists for "victims of the prohibited discrimination." 441 U.S., at 703 (emphasis added). Not some of the prohibited discrimination, but all of it.[4]
 
 
 29
 Moreover, Cannon was itself a disparate-impact case. In that case, the plaintiff brought suit against two private universities challenging medical school admissions policies that set age limits for applicants. Plaintiff, a 39-year-old woman, alleged that these rules had the effect of discriminating against women because the incidence of interrupted higher education is higher among women than among men. In providing a shorthand description of her claim in the text of the opinion, we ambiguously stated that she had alleged that she was denied admission "because she is a woman," but we appended a lengthy footnote setting forth the details of her disparate-impact claim. Other than the shorthand description of her claim, there is not a word in the text of the opinion even suggesting that she had made the improbable allegation that the University of Chicago and Northwestern University had intentionally discriminated against women. In the context of the entire opinion (including both its analysis and its uncontested description of the facts of the case), that single ambiguous phrase provides no basis for limiting the case's holding to incidents of intentional discrimination. If anything, the fact that the phrase "because she is a woman" encompasses both intentional and disparate-impact claims should have made it clear that the reasoning in the opinion was equally applicable to both types of claims. In any event, the holding of the case certainly applied to the disparate-impact claim that was described in detail in footnote 1 of the opinion, id., at 680.
 
 
 30
 Our fractured decision in Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983), reinforces the conclusion that this issue is effectively settled. While the various opinions in that case took different views as to the spectrum of relief available to plaintiffs in Title VI cases, a clear majority of the Court expressly stated that private parties may seek injunctive relief against governmental practices that have the effect of discriminating against racial and ethnic minorities. Id., at 594-595, 607 (White, J.); id., at 634 (Marshall, J., dissenting); id., at 638 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). As this case involves just such an action, its result ought to follow naturally from Guardians.
 
 
 31
 As I read today's opinion, the majority declines to accord precedential value to Guardians because the five Justices in the majority were arguably divided over the mechanism through which private parties might seek such injunctive relief.[5] This argument inspires two responses. First, to the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C. 1983 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of re-challenging Alabama's English-only policy in a complaint that invokes 1983 even after today's decision.
 
 
 32
 More important, the majority's reading of Guardians is strained even in reference to the broader question whether injunctive relief is available to remedy violations of the Title VI regulations by nongovernmental grantees. As Guardians involved an action against a governmental entity, making 1983 relief available, the Court might have discussed the availability of judicial relief without addressing the scope of the implied private right of action available directly under Title VI. See 463 U. S., at 638 (Stevens, J.) ("Even if it were not settled by now that Title VI authorizes appropriate relief, both prospective and retroactive, to victims of racial discrimination at the hands of recipients of federal funds, the same result would follow in this case because the petitioners have sought relief under 42 U.S.C. 1983" (emphasis deleted)). However, the analysis in each of the relevant opinions did not do so.[6] Rather than focusing on considerations specific to 1983, each of these opinions looked instead to our opinion in Cannon, to the intent of the Congress that adopted Title VI and the contemporaneous executive decisionmakers who crafted the Disparate-impact regulations, and to general principles of remediation.[7]
 
 
 33
 In summary, there is clear precedent of this Court for the proposition that the plaintiffs in this case can seek injunctive relief either through an implied right of action or through 1983. Though the holding in Guardians does not compel the conclusion that a private right of action exists to enforce the Title VI regulations against private parties, the rationales of the relevant opinions strongly imply that result. When that fact is coupled with our holding in Cannon and our unanimous decision in Lau, the answer to the question presented in this case is overdetermined.[8] Even absent my continued belief that Congress intended a private right of action to enforce both Title VI and its implementing regulations, I would answer the question presented in the affirmative and affirm the decision of the Court of Appeals as a matter of stare decisis.[9]
 
 II
 
 34
 Underlying the majority's dismissive treatment of our prior cases is a flawed understanding of the structure of Title VI and, more particularly, of the relationship between 601 and 602. To some extent, confusion as to the relationship between the provisions is understandable, as Title VI is a deceptively simple statute. Section 601 of the Act lays out its straightforward commitment: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d. Section 602 "authorize[s] and direct[s]" all federal departments and agencies empowered to extend federal financial assistance to issue "rules, regulations, or orders of general applicability" in order to "effectuate" 601's antidiscrimination mandate. 42 U.S.C. 2000d-1.[10]
 
 
 35
 On the surface, the relationship between 601 and 602 is unproblematic-601 states a basic principle, 602 authorizes agencies to develop detailed plans for defining the contours of the principle and ensuring its enforcement. In the context of federal civil rights law, however, nothing is ever so simple. As actions to enforce 601's antidiscrimination principle have worked their way through the courts, we have developed a body of law giving content to 601's broadly worded commitment. E.g., United States v. Fordice, 505 U.S. 717, 732, n. 7 (1992); Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978). As the majority emphasizes today, the Judiciary's understanding of what conduct may be remedied in actions brought directly under 601 is, in certain ways, more circumscribed than the conduct prohibited by the regulations. See, e.g., ante, at 5.
 
 
 36
 Given that seeming peculiarity, it is necessary to examine closely the relationship between 601 and 602, in order to understand the purpose and import of the regulations at issue in this case. For the most part, however, the majority ignores this task, assuming that the judicial decisions interpreting 601 provide an authoritative interpretation of its true meaning and treating the regulations promulgated by the agencies charged with administering the statute as poor step-cousins-either parroting the text of 601 (in the case of regulations that prohibit intentional discrimination) or forwarding an agenda untethered to 601's mandate (in the case of disparate-impact regulations).
 
 
 37
 The majority's statutory analysis does violence to both the text and the structure of Title VI. Section 601 does not stand in isolation, but rather as part of an integrated remedial scheme. Section 602 exists for the sole purpose of forwarding the antidiscrimination ideals laid out in 601.[11] The majority's persistent belief that the two sections somehow forward different agendas finds no support in the statute. Nor does Title VI anywhere suggest, let alone state, that for the purpose of determining their legal effect, the "rules, regulations, [and] orders of general applicability" adopted by the agencies are to be bifurcated by the judiciary into two categories based on how closely the courts believe the regulations track the text of 601.
 
 
 38
 What makes the Court's analysis even more troubling is that our cases have already adopted a simpler and more sensible model for understanding the relationship between the two sections. For three decades, we have treated 602 as granting the responsible agencies the power to issue broad prophylactic rules aimed at realizing the vision laid out in 601, even if the conduct captured by these rules is at times broader than that which would otherwise be prohibited.
 
 
 39
 In Lau, our first Title VI case, the only three Justices whose understanding of 601 required them to reach the question explicitly endorsed the power of the agencies to adopt broad prophylactic rules to enforce the aims of the statute. As Justice Stewart explained, regulations promulgated pursuant to 602 may "go beyond . . . 601" as long as they are "reasonably related" to its antidiscrimination mandate. 414 U.S., at 571 (Stewart, J., joined by Burger, C. J., and Blackmun, J., concurring in result). In Guardians, at least three Members of the Court adopted a similar understanding of the statute. See 463 U.S., at 643 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). Finally, just 16 years ago, our unanimous opinion in Alexander v. Choate, 469 U.S. 287 (1985), treated this understanding of Title VI's structure as settled law. Writing for the Court, Justice Marshall aptly explained the interpretation of 602's grant of regulatory power that necessarily underlies our prior caselaw: "In essence, then, we [have] held that Title VI [has] delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and [are] readily enough remediable, to warrant altering the practices of the federal grantees that ha[ve] produced those impacts." Id., at 293- 294.
 
 
 40
 This understanding is firmly rooted in the text of Title VI. As 602 explicitly states, the agencies are authorized to adopt regulations to "effectuate" 601's antidiscrimination mandate. 42 U.S.C. 2000d-1. The plain meaning of the text reveals Congress' intent to provide the relevant agencies with sufficient authority to transform the statute's broad aspiration into social reality. So too does a lengthy, consistent, and impassioned legislative history.[12]
 
 
 41
 This legislative design reflects a reasonable-indeed inspired-model for attacking the often-intractable problem of racial and ethnic discrimination. On its own terms, the statute supports an action challenging policies of federal grantees that explicitly or unambiguously violate antidiscrimination norms (such as policies that on their face limit benefits or services to certain races). With regard to more subtle forms of discrimination (such as schemes that limit benefits or services on ostensibly race-neutral grounds but have the predictable and perhaps intended consequence of materially benefiting some races at the expense of others), the statute does not establish a static approach but instead empowers the relevant agencies to evaluate social circumstances to determine whether there is a need for stronger measures.[13] Such an approach builds into the law flexibility, an ability to make nuanced assessments of complex social realities, and an admirable willingness to credit the possibility of progress.
 
 
 42
 The "effects" regulations at issue in this case represent the considered judgment of the relevant agencies that discrimination on the basis of race, ethnicity, and national origin by federal contractees are significant social problems that might be remedied, or at least ameliorated, by the application of a broad prophylactic rule. Given the judgment underlying them, the regulations are inspired by, at the service of, and inseparably intertwined with 601's antidiscrimination mandate. Contrary to the majority's suggestion, they "appl[y]" 601's prohibition on discrimination just as surely as the intentional discrimination regulations the majority concedes are privately enforceable. Ante, at 7.
 
 
 43
 To the extent that our prior cases mischaracterize the relationship between 601 and 602, they err on the side of underestimating, not overestimating, the connection between the two provisions. While our cases have explicitly adopted an understanding of 601's scope that is somewhat narrower than the reach of the regulations,[14] they have done so in an unorthodox and somewhat haphazard fashion.
 
 
 44
 Our conclusion that the legislation only encompasses intentional discrimination was never the subject of thorough consideration by a Court focused on that question. In Bakke, five Members of this Court concluded that 601 only prohibits race-based affirmative action programs in situations where the Equal Protection Clause would impose a similar ban. 438 U.S., at 287 (principal opinion of Powell, J.); id., at 325, 328, 352 (Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part).[15] In Guardians, the majority of the Court held that the analysis of those five Justices in Bakke compelled as a matter of stare decisis the conclusion that 601 does not on its own terms reach disparate impact cases. 463 U.S., at 610-611 (Powell, J., concurring in judgment); id., at 612 (O'Connor, J., concurring in judgment); id., at 642 (Stevens, J., joined by Brennan and Blackmun, JJ.). However, the opinions adopting that conclusion did not engage in any independent analysis of the reach of 601. Indeed, the only writing on this subject came from two of the five Members of the Bakke "majority," each of whom wrote separately to reject the remaining Justices' understanding of their opinions in Bakke and to insist that 601 does in fact reach some instances of unintentional discrimination. 463 U.S., at 589-590 (White, J.); id., at 623-624 (Marshall, J., dissenting).[16] The Court's occasional rote invocation of this Guardians majority in later cases ought not obscure the fact that the question whether 601 applies to disparate-impact claims has never been analyzed by this Court on the merits.[17]
 
 
 45
 In addition, these Title VI cases seemingly ignore the well-established principle of administrative law that is now most often described as the "Chevron doctrine." See Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In most other contexts, when the agencies charged with administering a broadly-worded statute offer regulations interpreting that statute or giving concrete guidance as to its implementation, we treat their interpretation of the statute's breadth as controlling unless it presents an unreasonable construction of the statutory text. See ibid. While there may be some dispute as to the boundaries of Chevron deference, see, e.g., Christensen v. Harris County, 529 U.S. 576 (2000), it is paradigmatically appropriate when Congress has clearly delegated agencies the power to issue regulations with the force of law and established formal procedures for the promulgation of such regulations.[18]
 
 
 46
 If we were writing on a blank slate, we might very well conclude that Chevron and similar cases decided both before and after Guardians provide the proper framework for understanding the structure of Title VI. Under such a reading there would be no incongruity between 601 and 602. Instead, we would read 602 as granting the federal agencies responsible for distributing federal funds the authority to issue regulations interpreting 601 on the assumption that their construction will-if reasonable-be incorporated into our understanding of 601's meaning.[19]
 
 
 47
 To resolve this case, however, it is unnecessary to answer the question whether our cases interpreting the reach of 601 should be reinterpreted in light of Chevron. If one understands the relationship between 601 and 602 through the prism of either Chevron or our prior Title VI cases, the question presented all but answers itself. If the regulations promulgated pursuant to 602 are either an authoritative construction of 601's meaning or prophylactic rules necessary to actualize the goals enunciated in 601, then it makes no sense to differentiate between private actions to enforce 601 and private actions to enforce 602. There is but one private action to enforce Title VI, and we already know that such an action exists.[20] See Cannon, 441 U.S., at 703.
 
 III
 
 48
 The majority couples its flawed analysis of the structure of Title VI with an uncharitable understanding of the substance of the divide between those on this Court who are reluctant to interpret statutes to allow for private rights of action and those who are willing to do so if the claim of right survives a rigorous application of the criteria set forth in Cort v. Ash, 422 U.S. 66 (1975). As the majority narrates our implied right of action jurisprudence, ante, at 10-11, the Court's shift to a more skeptical approach represents the rejection of a common-law judicial activism in favor of a principled recognition of the limited role of a contemporary "federal tribunal." Ante, at 10. According to its analysis, the recognition of an implied right of action when the text and structure of the statute do not absolutely compel such a conclusion is an act of judicial self-indulgence. As much as we would like to help those disadvantaged by discrimination, we must resist the temptation to pour ourselves "one last drink." Ante, at 11. To do otherwise would be to "ventur[e] beyond Congress's intent." Ibid.
 
 
 49
 Overwrought imagery aside, it is the majority's approach that blinds itself to congressional intent. While it remains true that, if Congress intends a private right of action to support statutory rights, "the far better course is for it to specify as much when it creates those rights," Cannon, 441 U.S., at 717, its failure to do so does not absolve us of the responsibility to endeavor to discern its intent. In a series of cases since Cort v. Ash, we have laid out rules and developed strategies for this task.
 
 
 50
 The very existence of these rules and strategies assumes that we will sometimes find manifestations of an implicit intent to create such a right. Our decision in Cannon represents one such occasion. As the Cannon opinion iterated and reiterated, the question whether the plaintiff had a right of action that could be asserted in federal court was a "question of statutory construction," 441 U. S, at 688, see also id., at 717 (Rehnquist, J., concurring), not a question of policy for the Court to decide. Applying the Cort v. Ash factors, we examined the nature of the rights at issue, the text and structure of the statute, and the relevant legislative history.[21] Our conclusion was that Congress unmistakably intended a private right of action to enforce both Title IX and Title VI. Our reasoning-and, as I have demonstrated, our holding-was equally applicable to intentional discrimination and disparate impact claims.[22]
 
 
 51
 Underlying today's opinion is the conviction that Cannon must be cabined because it exemplifies an "expansive rights-creating approach." Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 77 (1992) (Scalia, J. concurring in judgment). But, as I have taken pains to explain, it was Congress, not the Court, that created the cause of action, and it was the Congress that later ratified the Cannon holding in 1986 and again in 1988. See 503 U.S., at 72-73.
 
 
 52
 In order to impose its own preferences as to the availability of judicial remedies, the Court today adopts a methodology that blinds itself to important evidence of congressional intent. It is one thing for the Court to ignore the import of our holding in Cannon, as the breadth of that precedent is a matter upon which reasonable jurists may differ. It is entirely another thing for the majority to ignore the reasoning of that opinion and the evidence contained therein, as those arguments and that evidence speak directly to the question at issue today. As I stated above, see n. 21, supra, Cannon carefully explained that both Title VI and Title IX were intended to benefit a particular class of individuals, that the purposes of the statutes would be furthered rather than frustrated by the implication of a private right of action, and that the legislative histories of the statutes support the conclusion that Congress intended such a right. See also Part IV, infra. Those conclusions and the evidence supporting them continue to have force today.
 
 
 53
 Similarly, if the majority is genuinely committed to deciphering congressional intent, its unwillingness to even consider evidence as to the context in which Congress legislated is perplexing. Congress does not legislate in a vacuum. As the respondent and the Government suggest, and as we have held several times, the objective manifestations of congressional intent to create a private right of action must be measured in light of the enacting Congress' expectations as to how the judiciary might evaluate the question. See Thompson v. Thompson, 484 U.S. 174 (1988); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 378-379 (1982); Cannon, 441 U.S., at 698-699.[23]
 
 
 54
 At the time Congress was considering Title VI, it was normal practice for the courts to infer that Congress intended a private right of action whenever it passed a statute designed to protect a particular class that did not contain enforcement mechanisms which would be thwarted by a private remedy. See Merrill Lynch, 456 U.S., at 374-375 (discussing this history). Indeed, the very year Congress adopted Title VI, this Court specifically stated that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964). Assuming, as we must, that Congress was fully informed as to the state of the law, the contemporary context presents important evidence as to Congress' intent-evidence the majority declines to consider.
 
 
 55
 Ultimately, respect for Congress' prerogatives is measured in deeds, not words. Today, the Court coins a new rule, holding that a private cause of action to enforce a statute does not encompass a substantive regulation issued to effectuate that statute unless the regulation does nothing more than "authoritatively construe the statute itself." Ante, at 7.[24] This rule might be proper if we were the kind of "common-law court" the majority decries, ante, at 10, inventing private rights of action never intended by Congress. For if we are not construing a statute, we certainly may refuse to create a remedy for violations of federal regulations. But if we are faithful to the commitment to discerning congressional intent that all Members of this Court profess, the distinction is untenable. There is simply no reason to assume that Congress contemplated, desired, or adopted a distinction between regulations that merely parrot statutory text and broader regulations that are authorized by statutory text.[25]
 
 IV
 
 56
 Beyond its flawed structural analysis of Title VI and an evident antipathy toward implied rights of action, the majority offers little affirmative support for its conclusion that Congress did not intend to create a private remedy for violations of the Title VI regulations.26 The Court offers essentially two reasons for its position. First, it attaches significance to the fact that the "rights-creating" language in 601 that defines the classes protected by the statute is not repeated in 602. Ante, at 13-14. But, of course, there was no reason to put that language in 602 because it is perfectly obvious that the regulations authorized by 602 must be designed to protect precisely the same people protected by 601. Moreover, it is self-evident that, linguistic niceties notwithstanding, any statutory provision whose stated purpose is to "effectuate" the eradication of racial and ethnic discrimination has as its "focus" those individuals who, absent such legislation, would be subject to discrimination.
 
 
 57
 Second, the Court repeats the argument advanced and rejected in Cannon that the express provision of a fund cut-off remedy "suggests that Congress intended to preclude others." Ante, at 14. In Cannon, 441 U.S., at 704-708, we carefully explained why the presence of an explicit mechanism to achieve one of the statute's objectives (ensuring that federal funds are not used "to support discriminatory practices") does not preclude a conclusion that a private right of action was intended to achieve the statute's other principal objective ("to provide individual citizens effective protection against those practices"). In support of our analysis, we offered policy arguments, cited evidence from the legislative history, and noted the active support of the relevant agencies. Ibid. In today's decision, the Court does not grapple with-indeed, barely acknowledges-our rejection of this argument in Cannon.
 
 
 58
 Like much else in its opinion, the present majority's unwillingness to explain its refusal to find the reasoning in Cannon persuasive suggests that today's decision is the unconscious product of the majority's profound distaste for implied causes of action rather than an attempt to discern the intent of the Congress that enacted Title VI of the Civil Rights Act of 1964. Its colorful disclaimer of any interest in "venturing beyond Congress's intent," ante, at 11, has a hollow ring.
 
 V
 
 59
 The question the Court answers today was only an open question in the most technical sense. Given the prevailing consensus in the Courts of Appeals, the Court should have declined to take this case. Having granted certiorari, the Court should have answered the question differently by simply according respect to our prior decisions. But most importantly, even if it were to ignore all of our post-1964 writing, the Court should have answered the question differently on the merits.
 
 
 60
 I respectfully dissent.
 
 
 
 NOTES:
 
 
 [1]
 Just about every Court of Appeals has either explicitly or implicitly held that a private right of action exists to enforce all of the regulations issued pursuant to Title VI, including the disparate-impact regulations. For decisions holding so most explicitly, see, e.g. Powell v. Ridge, 189 F.3d 387, 400 (CA3 1999); Chester Residents Concerned for Quality Living v. Seif, 132 F.3d 925, 936-937 (CA3 1997), summarily dism'd, 524 U.S. 974 (1998); David K. v. Lane, 839 F.2d 1265, 1274 (CA7 1988); Sandoval v. Hogan, 197 F.3d 484 (CA11 1999) (case below). See also Latinos Unidos De Chelsea v. Secretary of Housing and Urban Development, 799 F.2d 774, 785, n. 20 (CA1 1986); New York Urban League, Inc. v. New York, 71 F.3d 1031, 1036 (CA2 1995); Ferguson v. Charleston, 186 F.3d 469 (CA4 1999), rev'd on other grounds, 532 U.S. __ (2001); Castaneda v. Pickard, 781 F.2d 456, 465, n. 11 (CA5 1986); Buchanan v. Bolivar, 99 F.3d 1352, 1356, n. 5 (CA6 1996); Larry P.. v. Riles, 793 F.2d 969, 981-982 (CA9 1986); Villanueva v. Carere, 85 F.3d 481, 486 (CA10 1996). No Court of Appeals has ever reached a contrary conclusion. But cf. New York City Environmental Justice Alliance v. Giuliani, 214 F.3d 65, 72 (CA2 2000) (suggesting that the question may be open).
 
 
 [2]
 Indeed, it would have been remarkable if the majority had offered any disagreement with the concurring analysis as the concurring Justices grounded their argument in well&nbhyph;established principles for determining the availability of remedies under regulations, principles that all but one Member of the Court had endorsed the previous Term. See Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369 (1973); id., at 378 (Douglas, J., joined by Stewart and Rehnquist, JJ., concurring in part and dissenting in part) (agreeing with the majority's analysis of the regulation in question); but see id., at 383, n. 1 (Powell, J., dissenting) (reserving analysis of the regulation's validity). The other decision the concurring Justices cited for this well-established principle was unanimous and only five years old. See Thorpe v. Housing Authority of Durham, 393 U.S. 268 (1969).
 
 
 [3]
 See Cannon, 441 U.S., at 687, 699, 702, n. 33, 703, 706, n. 40, 709.
 
 
 [4]
 The majority is undoubtedly correct that Cannon was not a case about the substance of Title IX but rather about the remedies available under that statute. Therefore, Cannon can not stand as a precedent for the proposition either that Title IX and its implementing regulations reach intentional discrimination or that they do not do so. What Cannon did hold is that all the discrimination prohibited by the regulatory scheme contained in Title IX may be the subject of a private lawsuit. As the Court today concedes that Cannon's holding applies to Title VI claims as well as Title IX claims, ante, at 3-4, and assumes that the regulations promulgated pursuant to 602 are validly promulgated antidiscrimination measures, ante, at 5, it is clear that today's opinion is in substantial tension with Cannon's reasoning and holding.
 
 
 [5]
 None of the relevant opinions was absolutely clear as to whether it envisioned such suits as being brought directly under the statute or under 42 U.S.C. 1983. However, a close reading of the opinions leaves little doubt that all of the Justices making up the Guardians majority contemplated the availability of private actions brought directly under the statute. Justice White fairly explicitly rested his conclusion on Cannon's holding that an implied right of action exists to enforce the terms of both Title VI and Title IX. Guardians, 463 U.S., at 594-595. Given that fact and the added consideration that his opinion appears to have equally contemplated suits against private and public parties, it is clear that he envisioned the availability of injunctive relief directly under the statute. Justice Marshall's opinion never mentions 1983 and refers simply to "Title VI actions." Id., at 625. In addition, his opinion can only be read as contemplating suits on equal terms against both public and private grantees, thus also suggesting that he assumed such suits could be brought directly under the statute. That leaves my opinion. Like Justice White, I made it quite clear that I believed the right to sue to enforce the disparate-impact regulations followed directly from Cannon and, hence, was built directly into the statute. 463 U.S., at 635-636, and n. 1. However, I did also note that, in the alternative, relief would be available in that particular case under 1983.
 
 
 [6]
 The Court today cites one sentence in my final footnote in Guardians that it suggests is to the contrary. Ante, at 7 (citing 463 U.S., at 645, n. 18). However, the Court misreads that sentence. In his opinion in Guardians, Justice Powell had stated that he would affirm the judgment for the reasons stated in his dissent in Cannon, see 463 U.S., at 609-610 (opinion concurring in judgment), and that he would also hold that private actions asserting violations of Title VI could not be brought under 1983, id., at 610, and n. 3. One reason that he advanced in support of these conclusions was his view that the standard of proof in a 1983 action against public officials would differ from the standard in an action against private defendants. Id., at 608, n. 1. In a footnote at the end of my opinion, id., at 645, n. 18, I responded (perhaps inartfully) to Justice Powell. I noted that the fact that 1983 authorizes a lawsuit against the police department based on its violation of the governing administrative regulations did not mean, as Justice Powell had suggested, "that a similar action would be unavailable against a similarly situated private party." Ibid. I added the sentence that the Court quotes today, ante at 7, not to reserve a question, but rather to explain that the record did not support Justice Powell's hypothesis regarding the standard of proof. I thought then, as I do now, that a violation of regulations adopted pursuant to Title VI may be established by proof of discriminatory impact in a 1983 action against state actors and also in an implied action against private parties. See n. 5, supra. Contrary to the Court's partial quotation of my opinion, see ante, at 7, n. 3, what I wrote amply reflected what I thought. See 463 U.S., at 635 ("a private action against recipients of federal funds"), id., at 636 ("implied caus[e] of action"); id., at 638 ("Title VI authorizes appropriate relief"). Justice Powell was quite correct in noting that it would be anomalous to assume that Congress would have intended to make it easier to recover from public officials than from private parties. That anomaly, however, does not seem to trouble the majority today.
 
 
 [7]
 See n. 5, supra.
 
 
 [8]
 See also Bazemore v. Friday, 478 U.S. 385 (1986) (per curiam) (adjudicating on the merits a claim brought under Title VI regulations).
 
 
 [9]
 The settled expectations the Court undercuts today derive not only from judicial decisions, but also from the consistent statements and actions of Congress. Congress' actions over the last two decades reflect a clear understanding of the existence of a private right action to enforce Title VI and its implementing regulations. In addition to numerous other small-scale amendments, Congress has twice adopted legislation expanding the reach of Title VI. See Civil Rights Restoration Act of 1987, 6, 102 Stat. 31 (codified at 42 U.S.C. 2000d-4a) (expanding definition of "program"); Rehabilitation Act Amendments of 1986, 1003, 100 Stat. 1845 (codified at 42 U.S.C. 2000d-7) (explicitly abrogating States' Eleventh Amendment immunity in suits under Title VI). Both of these bills were adopted after this Court's decision in Lau, Cannon, and Guardians, and after most of the Courts of Appeals had affirmatively acknowledged an implied private right of action to enforce the disparate impact regulations. Their legislative histories explicitly reflect the fact that both proponents and opponents of the bills assumed that the full breadth of Title VI (including the disparate impact regulations promulgated pursuant to it) would be enforceable in private actions. See, e.g., Civil Rights Act of 1984: Hearings on S. 2658 before the Subcommittee. on the Constitution of the Senate Committee on the Judiciary, 98th Cong., 2d Sess., 530 (1984) (memo from the Office of Management and Budget objecting to the Civil Rights Restoration Act of 1987 because it would bring more entities within the scope of Title VI thereby subjecting them to "private lawsuits" to enforce the disparate impact regulations); id. at 532 (same memo warning of a proliferation of "discriminatory effects" suits by "members of the bar" acting as "private Attorneys General"); 134 Cong. Rec. 4257 (1988) (statement of Sen. Hatch) (arguing that the disparate impact regulations go too far and noting that that is a particular problem because "[o]f course, advocacy groups will be able to bring private lawsuits making the same allegations before federal judges"); see also Brief for United States 24, n. 16 (collecting testimony of academics advising Congress that private lawsuits were available to enforce the disparate impact regulations under existing precedent). Thus, this case goes well beyond the normal situation in which "after a comprehensive reeaxmination and significant amendment" Congress "left intact the statutory provisions under which the federal courts had implied a private cause of action." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-382 (1982). Here, there is no need to rest on presumptions of knowledge and ratification, because the direct evidence of Congress' understanding is plentiful.
 
 
 [10]
 The remainder of Title VI provides for judicial and administrative review of agency actions taken pursuant to the statute, 2000d-2; imposes certain limitations not at issue in this case, 2000d-3 to 2000d-4; and defines some of the terms found in the other provisions of the statute, 200d-4a.
 
 
 [11]
 See 42 U.S.C. 2000d-1 (602) ("Each Federal department and agency which is empowered to extend Federal financial assistance ... is authorized and directed to effectuate the provisions of [601] ... by issuing rules, regulations, or orders of general applicability").
 
 
 [12]
 See, e.g., 110 Cong. Rec. 6543 (1964) (statement of Sen. Humphrey) ("Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination"); id., at 1520 (statement of Rep. Celler) (describing 602 as requiring federal agencies to "reexamine" their programs "to make sure that adequate action has been taken to preclude ... discrimination") .
 
 
 [13]
 It is important, in this context, to note that regulations prohibiting policies that have a disparate impact are not necessarily aimed only-or even primarily-at unintentional discrimination. Many policies whose very intent is to discriminate are framed in a race-neutral manner. It is often difficult to obtain direct evidence of this motivating animus. Therefore, an agency decision to adopt disparate&nbhyph;impact regulations may very well reflect a determination by that agency that substantial intentional discrimination pervades the industry it is charged with regulating but that such discrimination is difficult to prove directly. As I have stated before: "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." Washington v. Davis, 426 U.S. 229, 253 (1976) (concurring opinion). On this reading, Title VI simply accords the agencies the power to decide whether or not to credit such evidence.
 
 
 [14]
 See, e.g., Alexander v. Choate, 469 U.S. 287, 293 (1985) (stating, in dicta, "Title VI itself directly reach[es] only instances of intentional discrimination"); Guardians Assn. v. Civil Serv. Comm'n of New York City, 463 U.S. 582 (1983) (in separate opinions, seven Justices indicate that 601 on its face bars only intentional discrimination).
 
 
 [15]
 Of course, those five Justices divided over the application of the Equal Protection Clause-and by extension Title VI-to affirmative action cases. Therefore, it is somewhat strange to treat the opinions of those five Justices in Bakke as constituting a majority for any particular substantive interpretation of Title VI.
 
 
 [16]
 The fact that Justices Marshall and White both felt that the opinion they coauthored in Bakke did not resolve the question whether Title VI on its face reaches disparate-impact claims belies the majority's assertion that Bakke "had drawn precisely that distinction," ante, at 6, n. 2, much less its implication that it would have been "absurd" to think otherwise, ibid.
 
 
 [17]
 In this context, it is worth noting that in a variety of other settings the Court has interpreted similarly ambiguous civil rights provisions to prohibit some policies based on their disparate impact on a protected group. See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971) (Title VII); City of Rome v. United States, 446 U.S. 156, 172-173 (1980) (5 of the Voting Rights Act); cf. Alexander v. Choate, 469 U.S., at 292-296 (explaining why the Rehabilitation Act of 1973, which was modeled after 601, might be considered to reach some instances of disparate impact and then assuming that it does for purposes of deciding the case).
 
 
 [18]
 In relying on the Chevron doctrine, I do not mean to suggest that our decision in Chevron stated a new rule that requires the wholesale reconsideration of our statutory interpretation precedents. Instead, I continue to adhere to my position in Sullivan v. Everhart, 494 U.S. 83, 103-104, n. 6 (1990) (stating that Chevron merely summarized "well-settled principles"). In suggesting that, with regard to Title VI, we might reconsider whether our prior decisions gave sufficient deference to the agencies' interpretation of the statute, I do no more than question whether in this particular instance we paid sufficient consideration to those "well-settled principles."
 
 
 [19]
 The legislative history strongly indicates that the Congress that adopted Title VI and the administration that proposed the statute intended that the agencies and departments would utilize the authority granted under 602 to shape the substantive contours of 601. For example, during the hearings that preceded the passage of the statute, Attorney General Kennedy agreed that the administrators of the various agencies would have the power to define "what constitutes discrimination" under Title VI and "what acts or omissions are to be forbidden." Civil Rights-The Presidents Program, 1963: Hearings before the Senate Committee on the Judiciary, 88th Cong., 1st Sess., 399-400 (1963); see also Civil Rights: Hearings before the House Committee on the Judiciary, 88th Cong., 1st Sess., pt. 4, p. 2740 (1963) (remarks of Attorney General Kennedy) (only after the agencies "establish the rules" will recipients "understand what they can and cannot do"). It was, in fact, concern for this broad delegation that inspired Congress to amend the pending bill to ensure that all regulations issued pursuant to Title VI would have to be approved by the President. See 42 U.S.C. 2000d-1 (laying out the requirement); 110 Cong. Rec. 2499 (1964) (remarks of Rep. Lindsay introducing the amendment). For further discussion of this legislative history, see Guardians, 463 U.S., at 615-624 (Marshall, J., dissenting); Abernathy, Title VI and the Constitution: A Regulatory Model for Defining "Discrimination," 70 Geo. L. J. 1 (1981).
 
 
 [20]
 The majority twice suggests that I "be[g] the question" whether a private right of action to enforce Title VI necessarily encompasses a right of action to enforce the regulations validly promulgated pursuant to the statute. Ante, at 6, n. 2, 17, n. 8. As the above analysis demonstrates, I do no such thing. On the contrary, I demonstrate that the disparate-impact regulations promulgated pursuant to 602 are-and have always been considered to be-an important part of an integrated remedial scheme intended to promote the statute's antidiscrimination goals. Given that fact, there is simply no logical or legal justification for differentiating between actions to enforce the regulations and actions to enforce the statutory text. Furthermore, as my integrated approach reflects the longstanding practice of this Court, see n. 2, supra, it is the majority's largely unexplained assumption that a private right of action to enforce the disparate-impact regulations must be independently established that "begs the question."
 
 
 [21]
 The text of the statute contained "an unmistakable focus on the benefited class," 441 U.S., at 691; its legislative history "rather plainly indicates that Congress intended to create such a remedy," id., at 694; the legislators' repeated references to private enforcement of Title VI reflected "their intent with respect to Title IX," id., at 696-698; and the absence of legislative action to change the prevailing view with respect to Title VI left us with "no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of prohibited discrimination," id., at 703.
 
 
 [22]
 We should not overlook the fact that Cannon was decided after the Bakke majority had concluded that the coverage of Title VI was co-extensive with the coverage of the Equal Protection Clause.
 
 
 [23]
 Like any other type of evidence, contextual evidence may be trumped by other more persuasive evidence. Thus, the fact that, when evaluating older statutes, we have at times reached the conclusion that Congress did not imply a private right of action does not have the significance the majority suggests. Ante, at 13-14.
 
 
 [24]
 Only one of this Court's myriad private right of action cases even hints at such a rule. See Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164, 173 (1994). Even that decision, however, does not fully support the majority's position for two important reasons. First, it is not at all clear that the majority opinion in that case simply held that the regulation in question could not be enforced by private action; the opinion also permits the reading, assumed by the dissent, that the majority was in effect invalidating the regulation in question. Id., at 200 (Stevens, J., dissenting) ("The majority leaves little doubt that the Exchange Act does not even permit the SEC to pursue aiders and abettors in civil enforcement actions under 10(b) and Rule 10b-5"). Second, that case involved a right of action that the Court has forthrightly acknowledged was judicially created in exactly the way the majority now condemns. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975) (describing private actions under Rule 10b-5 as "a judicial oak which has grown from little more than a legislative acorn"). As the action in question was in effect a common-law right, the Court was more within its rights to limit that remedy than it would be in a case, such as this one, where we have held that Congress clearly intended such a right.
 
 
 [25]
 See Guardians, 463 U.S., at 636 (Stevens, J., dissenting) ("It is one thing to conclude, as the Court did in Cannon, that the 1964 Congress, legislating when implied causes of action were the rule rather than the exception, reasonably assumed that the intended beneficiaries of Title VI would be able to vindicate their rights in court. It is quite another thing to believe that the 1964 Congress substantially qualified that assumption but thought it unnecessary to tell the Judiciary about the qualification").
 
 
 [26]
 The majority suggests that its failure to offer such support is irrelevant, because the burden is on the party seeking to establish the existence of an implied right of action. Ante, at 17, n. 8. That response confuses apples and oranges. Undoubtedly, anyone seeking to bring a lawsuit has the burden of establishing that private individuals have the right to bring such a suit. However, once the courts have examined the statutory scheme under which the individual seeks to bring a suit and determined that a private right of action does exist, judges who seek to impose heretofore unrecognized limits on that right have a responsibility to offer reasoned arguments drawn from the text, structure, or history of that statute in order to justify such limitations. Moreover, in this case, the petitioners have marshaled substantial affirmative evidence that a private right of action exists to enforce Title VI and the regulations validly promulgated thereunder. See supra, at 21-22. It strikes me that it aids rather than hinders their case that this evidence is already summarized in an opinion of this Court. See Cannon, 441 U.S., at 691-703.