quest for review of the detention order must be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Request for a Review and Appeal of the Court's Detention Order [doc. # 44] is **DENIED**.

**OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., and Howard Jenkins, Marshall Johnson, Susan Johnson, and Jerry Vanboetzelaer, Individually and on behalf of All Others Similarly Situated, Plaintiffs,**

v.

**NEW PRIME, INC., d/b/a/ Prime, Inc. and Success Leasing, Inc., Defendants.**

No. 97–3408–CV–S–1.

United States District Court, W.D. Missouri, Southern Division.

Dec. 17, 2001.

Daniel E. Cohen, The Cullen Law Firm, Washington, DC, Jerry Kirksey, Attorney at Law, Bolivar, for plaintiff.

James C. Sullivan, Richard M. Paul III, Shughart, Thompson, Kansas City, for defendant.

## ORDER

WHIPPLE, District Judge.

Pending before the Court is Defendants' Motion for Judgment on the Pleadings. Plaintiffs filed Suggestions in Opposition and Defendants replied thereto. Defendant argues that the Supreme Court's recent decision in *Alexander v. Sandoval* requires the Court to dismiss Plaintiffs' claims because there is no private right of action to enforce the regulations that Plaintiffs seek to enforce. *See Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). For the reasons stated herein, the Court DENIES Defendants' motion.

### *Background*

Plaintiffs are owner-operators who lease their truck equipment and provide driving services to Defendants. Defendants are motor carriers operating under the authority of the Department of Transportation ("DOT") and the Surface Transportation Board ("STB"), pursuant to 49 U.S.C. § 13501. The relationship between Plaintiffs and Defendants is governed predominately by federal law, 49 U.S.C. § 13101 *et. seq.*, and regulations codified at 49 C.F.R. § 350 *et. seq.*

In the pending action, Plaintiffs allege that Defendants' standard lease agreements violate the Truth–In–Leasing regulations as codified at 49 C.F.R. 376.12.

These regulations govern the agreements entered between the owner-operators, and the motor carriers for whom the owner-operators ship goods. Plaintiffs seek injunctive relief for regulatory violations pursuant to 49 U.S.C. § 14704(a)(1) and damages pursuant to 49 U.S.C. § 14704(a)(2). Specifically, Plaintiffs allege violations of the following regulations: (1) 49 C.F.R. § 376.12(h)—Charge-back Items; (2) 49 C.F.R. § 376.12(i)—Products, equipment, or services from authorized carrier; and (3) 49 C.F.R. § 376.12(k)—Escrow funds.

### Discussion

## I. Rule 12(c) Standard.

Defendants have filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The standard applied by the Court when considering a motion for judgment on the pleadings is the same as that applied to a motion to dismiss under Rule 12(b)(6). *See Gralike v. Cook,* 996 F.Supp. 901, 905 (W.D.Mo.1998). The Court must accept Plaintiffs' factual allegations as true and construe them in the light most favorable to the plaintiffs. *See Russell v. Men's Wearhouse, Inc.,* 170 F.3d 1156, 1157 (8th Cir.1999); *Springdale Educ. Ass'n v. Springdale Sch. Dist.,* 133 F.3d 649, 651 (8th Cir.1998). The Court may grant judgment on the pleadings only if it appears beyond a doubt that Plaintiffs can prove no set of facts entitling them to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 71, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *St. Paul Ramsey County Med. Ctr. v. Pennington County, S.D.* 857 F.2d 1185, 1188 (8th Cir.1988).

## II. Does the recent Supreme Court decision in *Alexander v. Sandoval* require the dismissal of Plaintiffs' claims?

Defendants argue that Plaintiffs' claims should be dismissed because they have brought an action to enforce regulations for which no private right of action exists. Defendants' argument is based on the Supreme Court's decision in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), in which the Court held that a private right of action does not exist to enforce disparate impact regulations promulgated pursuant to Section 602 of Title VI of the Civil Rights Act of 1964.

### A. The Supreme Court's Decision

*Alexander v. Sandoval* had its genesis in 1990 when the state of Alabama amended its Constitution to declare that English was "the official language of the state of Alabama." *Alexander,* 121 S.Ct. at 1515. Pursuant to that provision and, according to the state, to promote public safety, the Alabama Department of Public Safety began administering drivers' license examinations only in English. *See id.*

Martha Sandoval, as a representative of similarly situated individuals, filed suit to enjoin the Alabama English-only policy. *See id.* Sandoval sought relief under a regulation promulgated by the Department of Justice pursuant to Section 602 of Title VI forbidding a recipient of federal funds from using "criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin...." *Id.*; 28 C.F.R. § 42.104(b)(2) (1999). Section 602 of Title VI authorizes federal agencies to effectuate Section 601 through regulations, rules or orders of general applicability. *See* 42 U.S.C. § 2000d–1. Section 601 of Title VI prohibits discrimination on the grounds of "race, color, or national origin" in the administration of covered programs. *See* 42 U.S.C. § 2000d. The United States District Court for the Middle District of Alabama enjoined the English-only policy and the Court of Appeals for the Eleventh Circuit

affirmed. *Sandoval v. Hagan,* 197 F.3d 484 (11th Cir.1999).

James Alexander, the Director of the Alabama Department of Public Safety, appealed to the Supreme Court arguing that there was no private cause of action to enforce the disparate impact regulation at issue. *See Alexander* 121 S.Ct. at 1515. In addressing his claim, the Supreme Court began by making three assumptions about Title VI: (1) that a private right of action exists to enforce Section 601; (2) that Section 601 prohibits only intentional discrimination and; (3) that regulations promulgated pursuant to Section 602 may validly prohibit activities that have a disparate impact on racial groups even though such activities are not proscribed by Section 601. *See id* at 1515–17. The Court reasoned that these three assumptions did not necessarily lead to the conclusion that Congress intended a private right of action to enforce disparate impact regulations. *See id.* at 1518.

The Court, in distinguishing cases involving private actions brought to enforce disparate treatment regulations, reasoned that a private right of action to enforce Section 601 encompassed actions that authoritatively construe the statute itself because it would be "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *See id.* The Court reasoned that if Congress intends to allow private enforcement of a statute, then it necessarily intends the authoritative interpretation of the statute to be enforced in the same manner. *See id.* The Court reasoned, however, that the disparate impact regulations at issue, by forbidding conduct outside Section 601's scope, did not "authoritatively construe" Section 601 and thus a private right to enforce 601 did not necessarily implicate a private right to enforce the disparate impact regulations. *See id.* at 1519.

The Court held, therefore, that any private right of action to enforce a disparate impact regulation promulgated pursuant to Section 602 must spring from the language of Section 602 itself. *See id.* In order to determine whether that right exists, the Court reasoned that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.... Statutory intent on this latter point is determinative." *Id.* The search for that intent must begin with interpretation of the text of the statute itself. *See id.*

The Court reasoned that Section 602 was nothing more than a directive to the agencies to which it applied and as such, it evidenced *no congressional intent to create* a private right of action. *See id.* at 1521. Furthermore, the Court reasoned that the elaborate methods in Section 602 providing for agency enforcement of the regulations tended to evidence a congressional intent not to create private avenues of enforcement. *See id.* Thus, according to the Supreme Court, "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." *Id.* at 1523.

**B. Is there evidence of Congressional intent to create a freestanding private right of action to enforce the regulations at issue?**

 Defendant argues that the regulations upon which Plaintiffs' claims are based do not authoritatively construe a statute for which a private right of action exists. Defendants, in support of their motion for judgment on the pleadings, characterize the holding of *Alexander* as follows: "a private litigant does not have a private right of action to enforce regula-

tions unless those regulations 'authoritatively construe' a statute for which Congress has specifically provided a right of action." Defendants' Suggestions in Support of Motion for Judgment on the Pleadings at p. 3. This interpretation, however, does not accurately capture the Supreme Court's holding.

*Alexander* teaches that regulations that do not authoritatively construe a statute for which a private right of action exists are not enforceable through a private action *unless* there is evidence of Congressional intent to create a freestanding private right of action to enforce the regulations. In this case, unlike the statutory scheme at issue in *Alexander*, the intent to create a freestanding private right of action to enforce the regulations is present.

The authority under which Plaintiffs claim a right to enforce the regulations at issue appears at 49 U.S.C. § 14704(a). That section reads as follows:

(1) Enforcement of order.—A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection. *A per-*

*son may bring a civil action for injunctive relief for violations of sections 14102 and 14103.*

(2) Damages for violations.—A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 *is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.*

49 U.S.C. § 14704(a) (emphasis added). Earlier in this litigation, the Court of Appeals for the Eighth Circuit held that "49 U.S.C. § 14704(a) authorizes private actions for damages and injunctive relief to remedy at least some violations of the Motor Carrier Act and its implementing regulations." *Owner–Operator Indep. Ass'n, Inc. v. New Prime, Inc.,* 192 F.3d 778, 785 (8th Cir.1999).[1]

The court of appeals held that the second sentence of 49 U.S.C. § 14704(a)(1) authorized a private party to sue for injunctive relief for violations of regulations promulgated pursuant to 49 U.S.C. § 14102 which regulates the leases into which carriers and owner-operators enter. In holding that Section 14704(a)(1) granted private parties the right to enforce the regulations promulgated pursuant to § 14102, the court reasoned: "[b]ecause § 14102 contains no mandates or prohibitions but simply authorizes the Secretary

---

**1.** In reaching its holding, the eighth circuit relied heavily on the legislative history of the ICC Termination Act of 1995 stating that while the beginning of statutory interpretation always begins with the text of a statute, a court "cannot ignore the broader perspective." *Id.* at 781–82. The court cited the Report of the House Transportation and Infrastructure Committee regarding the ICC Termination Act which explained:

The bill transfers responsibility for all the areas in which the ICC resolves disputes to the Secretary (except passenger intercarrier disputes). *The Committee does not believe that DOT should allocate scarce resources to resolving these essentially private disputes,*

*and specifically directs that DOT should not continue the dispute resolution functions* .... *The bill provides that private parties may bring actions in court to enforce the provisions of the Motor Carrier Act.* This change will permit these private, commercial disputes to be resolved the way that all other commercial disputes are resolved—by the parties.

*Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 781 (citing H.R.Rep. No. 104–311, at 87–88 (1995), reprinted in 1995–2 U.S.C.C.A.N. 793, 799–800) (emphasis in original). Despite the unambiguous statement of intent in the history of the Act, the court went on to examine the language of the Act as enacted.

to adopt leasing requirements, *it would be impossible for a carrier to violate the statute other than by violating rules or regulations* promulgated under the statute." *Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 784 (emphasis added). In essence the only plausible interpretation of the last sentence of § 14704(a) is that it expressly authorizes suits for violations of regulations promulgated pursuant to § 14102.

The court of appeals then proceeded to analyze the language of § 14102 and held that, although not perfectly drafted, the most logical reading of 49 U.S.C. § 14704(a)(2) is that it expressly authorizes "private parties to sue for damages for carrier conduct 'in violation of [regulations promulgated under] this part.'" *Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 785 (bracketed language in original). The term "this part" refers to Part B of Subtitle IV of Title 49, 49 U.S.C. §§ 13101–14914.

The holding of the eighth circuit in this case regarding the effect of § 14704(a)(1) and (2) is clear and binding on this Court. The statute expressly authorizes suits for injunctive relief to remedy violations of regulations promulgated pursuant to 14102 and suits for damages to remedy violations of regulations promulgated under Part B of Subtitle IV of Title 49, 49 U.S.C. §§ 13101–14914.

The private action to enforce the Truth–in–Leasing regulations is not derivative of a right to enforce a statutory mandate as was the case in *Alexander.* The eighth circuit has found that for which the Supreme Court searched in *Alexander v. Sandoval;* the intent to create a freestanding private right of action to enforce the regulations. Therefore, the Supreme Court's decision in *Alexander v. Sandoval*

does not require dismissal of the Plaintiffs' claims.

### III. Do Plaintiffs have a right to injunctive relief for violations of the regulations at issue?

This Court's inquiry has not ended. Plaintiffs seek both injunctive relief and damages for violations of the regulations. A suit for damages is authorized for violations of regulations promulgated pursuant to Part B of Subtitle IV of Title 49, 49 U.S.C. §§ 13101–14914. *See* 49 U.S.C. § 14704(a)(2); *Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 785. A private action seeking injunctive relief, however, exists only for those regulations promulgated pursuant to 49 U.S.C. § 14102 or § 14103.[2] *See* 49 U.S.C. § 14704(a)(1); *Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 784.

The question whether the regulations were promulgated pursuant to § 14102 is relevant only to Plaintiffs's claims for injunctive relief. The action for damages authorized by § 14704(a)(2) extends to regulations promulgated under Part B of the Motor Carrier Act. *See* 49 U.S.C. § 14704(a)(2). Even if, as Defendant argues, the regulations at issue were not promulgated pursuant to § 14102, they were promulgated under the general authority bestowed by § 13301 which is contained in Part B of the act. In other words, if the regulations involved in this action were promulgated pursuant to a statutory authority other than § 14102, Plaintiffs only have a right of action for damages, not for injunctive relief. Thus, this Court must determine whether the regulations at issue were authorized by § 14102 in order to determine whether an action for injunctive relief is available.[3]

---

2. Section 14103 is not at issue in this suit.

3. This is a question expressly reserved by the eighth circuit earlier in this case. In referring to whether Plaintiffs' claim for injunctive relief is premised upon regulations beyond the scope of § 14102, the eighth circuit stated

Plaintiffs' claims are based on regulations codified at 49 C.F.R. 376.12. The preamble to that section states the written lease required between owner-operators and motor carriers shall contain the provisions enumerated therein and shall be adhered to by the motor carrier. *See* 49 C.F.R. 376.12. Plaintiffs allege that the form agreements used by Defendants violate the following regulations:

(h) Charge-back items. The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

\* \* \* \* \* \*

(i) Products, equipment, or services from authorized carrier. The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement. The lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

\* \* \* \* \* \*

(k) Escrow funds. If escrow funds are required, the lease shall specify:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:

(i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

(ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91–day, 13–week Treasury bills as established in the weekly auction by the Department of Treasury.

(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and

"[t]here is a simple answer to this contention— it is not part of the jurisdictional issues before us." *Owner–Operator Indep. Ass'n, Inc.,* 192 F.3d at 784.

shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

49 C.F.R. 376.12(h),(i) & (k).

These regulations deal with the disclosure of charge-backs and the details of escrow accounts against which charge-backs can be credited. *See* 49 C.F.R. § 376.12(h),(i) & (k). Plaintiffs argue that these regulations were promulgated pursuant to the language of § 14102 empowering the Secretary, or the Interstate Commerce Commission (ICC) at the time the regulations were enacted, to require motor carriers to reduce their leases to writing and to specify within the lease "the compensation to be paid by the motor carrier." *See* 49 U.S.C. § 14102(a).[4] Defendants argue that the regulations at issue are outside the scope of § 14102 and could only have been enacted pursuant to the ICC's general authority as granted in § 13301.

The ICC's general authority to regulate the trucking industry, now codified at 49 U.S.C. § 13301, was originally codified at 49 U.S.C. § 304(a)(6). Subsequent to the Supreme Court decision in *American Trucking Ass'ns v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), affirming that the authority granted the ICC included the authority to regulate leasing practices, Congress enacted Section 204(e) of the Interstate Commerce Act which added (e) to 49 U.S.C. § 304. Section 304(e) was recodified without substantial change at 49 U.S.C. § 11107(a). Section 11107(a) was recodified without substantial change at 49 U.S.C. § 14102(a) as part of the Interstate Commerce Commission Termination Act of 1995. In essence, § 14102(a) was intended to affirm the authority of the ICC, now the STB, to regulate leasing practices in the industry.

The regulations at issue grew out of a proceeding commenced in 1977, by the Interstate Commerce Commission (ICC) to address concerns over leasing practices within the industry. *See* 42 Fed.Reg. 59984 (Nov. 23, 1977). As authority for the proceedings at which the current regulations were issued, the ICC specifically cited 49 U.S.C. § 304(e). The notice invited comment on ten different items. *See id.*[5] It was out of these items that the regulations at issue were eventually born.

---

**4.** Section 14102 reads in its entirety as follows:

(a) General authority of Secretary.—The Secretary may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that uses motor vehicles not owned by it to transport property under an arrangement with another party to-

(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;

(2) carry a copy of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect;

(3) inspect the motor vehicles and obtain liability and cargo insurance on them; and

(4) have control of and be responsible for operating those motor vehicles in compli-

ance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

(b) Responsible party for loading and unloading.—The Secretary shall require, by regulation, that any arrangement, between a motor carrier of property providing transportation subject to jurisdiction under subchapter I of chapter 135 and any other person, under which such other person is to provide any portion of such transportation by a motor vehicle not owned by the carrier shall specify, in writing, who is responsible for loading and unloading the property onto and from the motor vehicle.

49 U.S.C. § 14102.

**5.** The items proposed for comment were: 1) Compensation for Equipment and Driver; 2) Payment by Authorized Carriers to Lessors

As general authority for the regulations, the ICC cited § 13301 as interpreted in *ATA. See* 129 *Lease and Interchange of Vehicles,* M.C.C. 700, 702–06. Then, the ICC further explained that "certain proposed rules are authorized by specific sections of the [Motor Carrier Act]." *Id.* at 706. The ICC then went through the ten items proposed for comment and the regulations which grew therefrom and gave the specific authority for each one. *See id.* at 706–07.

When detailing the specific authority for the various regulations at § 376.12, the ICC stated that § 376.12(k), a regulation at issue in this case dealing with escrow funds, "[is] consistent with our authority under section 204(e)(1)." *Id.* at 707. In reference to § 376.12(h) & (i), the other regulations at issue in this case, the ICC stated that the "specific authority" for these provisions was found in section 204(e)(1).[6] *Id.*

Thus it can be said that the specific provisions Plaintiffs seek to enforce, according to ICC, were within the commission's general jurisdiction pursuant to § 13301 and were specifically authorized by § 14102. This is not remarkable considering § 13301 was interpreted in *ATA* to give the Secretary wide-ranging jurisdiction to regulate the industry. In fact, all regulations promulgated pursuant to 14102 are within the wide range of authority bestowed by 13301.

Defendants argue that regardless of the authority cited by ICC, the Truth–in–Leasing regulations are outside the purview of § 14102. As authority for this proposition, Defendants cite the decision of the D.C. circuit in *Global Van Lines, Inc. v. Interstate Commerce Comm'n,* 627 F.2d 546 (D.C.Cir.1980).

In *Global Van Lines,* the petitioner challenged the ICC's authority to promulgate the Truth–in–Leasing regulations at issue in this suit. *See id.* at 547. First, the petitioner argued that § 11107, later to be recodified at § 14102, delineated the scope of the ICC's authority to regulate only those specific areas included within § 11107. *See id.* at 550. The petitioner argued that the regulations which deal with specific areas of escrow accounts were outside the scope of § 11107 and thus, invalid. *See id.*

The court was not forced to determine whether the regulations were properly promulgated pursuant to § 11107 because the Court rejected the first prong of the petitioners argument by holding that the proper scope of the ICC's authority was still that which was embodied by the Supreme Court decision in *ATA. See id.* The *ATA* court held that the Commission had wide power to regulate leasing practices within the industry. *See id.; ATA,* 344 U.S. at 312, 73 S.Ct. 307. Thus the commission was clearly within its jurisdiction in enacting the Truth–in–Leasing regulations. *See Global Van Lines,* 627 F.2d at 553. As a result, the D.C. circuit did not need to determine whether the regulations were enacted pursuant to § 14102 and thus, the case is of little value to the Court.

The Court finds that the regulations at issue in this suit, consistent with the ICC's

for Transportation Services Rendered; 3) Providing Copies of Rated Freight Bills at Time of Settlement; 4) Responsibility of Authorized Carriers for Fuel Costs and Other Items Associated with Transportation Services Rendered by Lessors; 5) Insurance; 6) Payment of Detention Charges to Lessors by Authorized Carriers; 7) License Plate Fee

Proration; 8) Escrow Funds; 9) Safety Requirements; and 10) Additional Areas for Consideration. *See* 42 Fed.Reg. 59984 (Nov. 23, 1977).

**6.** The ICC referred to Item 10 as sections 1057.12(i) & (j) which are now codified at 376.12(h) & (i) respectively.

interpretation at the time the regulations were enacted, were promulgated pursuant to § 14102(a). Specifically, § 376.12(h), (i) & (k) further the Secretary's efforts to require the motor carrier to specify details of "the compensation to be paid by the motor carrier." 49 U.S.C. § 14102(a)(1). Therefore, Plaintiff has asserted a valid cause of action for injunctive relief.

### *Order*

For the above stated reasons, the Court hereby DENIES Defendants' Motion for Judgment on the Pleadings.

IT IS SO ORDERED.