IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROGER O. MAHUWE, *Appellant*,

*v.*

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an agency,
*Appellee*.

No. 1 CA-UB 21-0148
FILED 5-11-2023

Appeal from the A.D.E.S. Appeals Board
No. U-1700193-001-B

**REVERSED AND REMANDED**

COUNSEL

Community Legal Services, Phoenix
By Nina Targovnik, Amanda Caldwell (argued), Danielle Morales
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee*

---

**OPINION**

Presiding Judge Paul J. McMurdie delivered the Court's opinion, in which Judge Michael J. Brown and Judge Michael S. Catlett joined.

---

**M c M U R D I E**, Judge:

¶1          Roger Mahuwe appeals from an Arizona Department of Economic Security ("ADES") Appeals Board decision finding he was ineligible for Pandemic Unemployment Assistance ("PUA") under the federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act of 2020. We reject Mahuwe's claim that ADES violated Mahuwe's due process rights or committed national origin discrimination by not providing an interpreter because there is nothing in the recording suggesting he could not communicate with the administrative law judge ("ALJ"). But as Mahuwe presented sufficient evidence that he quit his job as a direct result of COVID-19, and ADES presented no contrary evidence, we conclude that Mahuwe was eligible for PUA. We, therefore, reverse and remand for a determination of the amount of the award.

## FACTS AND PROCEDURAL BACKGROUND

¶2          Mahuwe worked as a self-employed Uber driver until March 11, 2020, after becoming ill with asthma. Mahuwe planned to resume driving after his condition improved, but on April 9, 2020, Uber sent its drivers an email advising safe practices during the COVID-19 pandemic. The email suggested that drivers should "consider wearing a face covering," "stay home if [they were] feeling sick," and "roll down the windows to improve ventilation," among other recommendations. The email did not tell drivers to stop driving. But after Mahuwe received the email, he did not resume driving until it became safe. He was 60 years old.

¶3          Meanwhile, on March 30, 2020, Arizona's Governor issued Executive Order 2020-18. This order encouraged Arizonans to limit time away from their homes but allowed for certain exceptions, such as essential activities or employment in essential functions. Ariz. Exec. Order No. 2020-18 (Mar. 30, 2020). Executive Order 2020-12 previously designated rideshare driving as an essential function. Ariz. Exec. Order No. 2020-12 (March 23, 2020).

¶4        On May 17, 2020, Mahuwe applied for PUA. He self-certified that he was "unable to reach [his] place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency." ADES began paying Mahuwe PUA benefits. On February 4, 2021, ADES mailed Mahuwe a letter informing him that he was disqualified from receiving PUA because he was "not unemployed as a direct result of one of the COVID-19 related reasons listed in Section 2102 of the CARES Act." Mahuwe appealed ADES's decision. When asked whether an interpreter was needed, he stated "No" in his appeal application.

¶5        An ALJ conducted a telephonic hearing. Mahuwe testified to the facts above in imperfect English, and near the end of the hearing, he explained that English was not his first language. Some portions of the testimony were transcribed as "inaudible."

¶6        The ALJ found Mahuwe was not eligible for PUA because he stopped working because of his asthma, not COVID-19. The ALJ concluded that Mahuwe voluntarily quit because of his asthma and because he was awaiting his COVID-19 vaccination. Thus, the ALJ found Mahuwe was not entitled to benefits under the CARES Act. Mahuwe appealed to the appeals board. The appeals board recognized Mahuwe as a vulnerable person but concluded that this was not an enumerated reason under the CARES Act. The appeals board therefore affirmed. Mahuwe timely sought review by this court.

¶7        We granted Mahuwe leave to appeal to this court under A.R.S § 41-1993(B) and appointed *pro bono* counsel to represent him.[1]

## DISCUSSION

¶8        We defer to ADES's findings of fact but review its legal conclusions *de novo*, and we will affirm if the decision is supported by substantial evidence and a reasonable interpretation of the record. *Simmons v. Ariz. Dep't of Econ. Sec.*, 254 Ariz. 109, 111, ¶ 10 (App. 2022), *review denied*, No. CV-22-0242-PR (Ariz. Apr. 7, 2023). We interpret the law and the facts liberally to grant benefits and narrowly to deny them. *Id.* at ¶ 11.

---

[1]    This court thanks Nina Targovnik, Amanda Caldwell, and Danielle Morales for their *pro bono* service.

**A.    ADES Did Not Violate Mahuwe's Due Process Rights or Commit National Origin Discrimination by Not Providing an Interpreter.**

**¶9**        Mahuwe first argues that ADES violated his due process rights by not offering or providing an interpreter for the hearing. He concedes that he raises this issue for the first time on appeal, and such issues are generally considered waived. *See Odom v. Farmers Ins. Co. of Ariz.*, 216 Ariz. 530, 535, ¶ 18 (App. 2007). But he asks us to consider this issue under an exception to the waiver rule that applies to matters of "statewide significance." *See Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 104 (1984) (quoting *Ruth v. Indus. Comm'n of Ariz.*, 107 Ariz. 572, 574 (1971)). Waiver is discretionary, and we may consider an issue otherwise waived when it "is of statewide importance, of constitutional dimension, or when the public interest is better served by having the issue considered rather than deferred." *Torres v. Jai Dining Servs. (Phoenix), Inc.*, 253 Ariz. 66, 71, ¶ 13 (App. 2022).

**¶10**       We agree with Mahuwe that the issue falls under the waiver exception. The issue is constitutional, does not turn on disputed facts, and the parties have briefed the matter. *See Barrio*, 143 Ariz. at 104 (applying the exception to a constitutional issue that did not turn on disputed facts). In addition, "a significant minority of [Arizona's] population is burdened with the handicap of being unable to effectively communicate in" English. *State v. Natividad*, 111 Ariz. 191, 194 (1974). We will therefore consider the merits of whether Mahuwe's due process rights were denied when he was not provided an interpreter.

**¶11**       We review questions of law, including due process claims, *de novo. Savord v. Morton*, 235 Ariz. 256, 260, ¶ 16 (App. 2014). Due process protections apply to PUA benefits because they "are a matter of statutory entitlement for persons qualified to receive them" and "[t]heir termination involves state action that adjudicates important rights." *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *see also Gallarzo v. Ariz. Dep't of Econ. Sec.*, 245 Ariz. 318, 321, ¶ 9 (App. 2018) ("All applicants, regardless of the merits of their claims, have a property interest in their right to use the statutorily established adjudicatory procedures."). "Due process entitles a party to notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Curtis v. Richardson*, 212 Ariz. 308, 312, ¶ 16 (App. 2006). A party claiming the denial of due process has the burden to show that denial. *Dep't of Child Safety v. Beene*, 235 Ariz. 300, 304, ¶ 8 (App. 2014).

**¶12**       Mahuwe argues that the hearing did not occur in a meaningful manner. Although he stated in his application that he did not

need an interpreter, he claims that ADES should have offered one after several "miscommunications."

¶13        In the criminal context, our supreme court has held that when a defendant does not request an interpreter, the trial court must still determine whether the nature and severity of the defendant's language difficulties are such that the defendant has a right to be informed of his right to have one. *Natividad*, 111 at 194–95. We see no reason the same principle should not apply in a benefits hearing.

¶14        Mahuwe ostensibly stated in his appeal application that he did not need an interpreter. The application, however, is in English, and it prompts the applicant only with "Interpreter" and allows a yes-or-no response. Although this will often suffice to preserve due process, we are not satisfied that simply stating "No" on such a form always constitutes a knowing and voluntary waiver of the right. *See Natividad*, 111 Ariz. at 194. We, therefore, hold that the tribunal must inform an applicant of his or her right to an interpreter if it becomes apparent that the applicant's English is so deficient that the applicant cannot understand the proceedings or effectively communicate with the tribunal. In that scenario, the tribunal must provide an interpreter unless the applicant knowingly and voluntarily waives the right. *See id.*

¶15        We recognize that the ALJ would be best positioned to determine whether Mahuwe's English skills allowed him to communicate effectively during the hearing. *See Natividad*, 111 Ariz. at 194. And here, the ALJ made no finding about Mahuwe's English skills. But we need not remand for such a determination because Mahuwe fails to explain how the "miscommunications" prevented him from being heard "in a meaningful manner."

¶16        For example, Mahuwe points to a moment when the ALJ asked him if he had any witnesses, and he responded, "No. Just me by myself, because I have the . . . paycheck and all the documents. I want to submit this one to you. . . . I believe [t]his one is [going to] be my witness." Mahuwe contends that this shows he misunderstood the distinction between a witness and an exhibit. But he does not argue that he had other witnesses who could not testify.

¶17        Mahuwe also claims that when the ALJ asked him twice what illness caused him to stop driving on March 11, "he never understood well enough to answer the ALJ's question as posed." For support, he cites parts of his initial response that were transcribed as "inaudible." But an

"inaudible" notation appears regularly in telephonic hearing transcripts and is not evidence of the lack of Mahuwe's English skills in this case. And although his initial response was unclear, when the ALJ then asked if the illness "had to do with [his] asthma," he responded, "Correct ma'am." More importantly, he does not allege on appeal that the illness relates to anything but his asthma.

¶18    Mahuwe does not identify any fact or argument he presented that the ALJ misunderstood or ignored when reaching a conclusion based on his lack of English skills. Thus, Mahuwe cannot show that he was not heard "in a meaningful manner." Mahuwe has not established that ADES violated his due process rights. *See Beene*, 235 Ariz. at 304, ¶ 8.

¶19    Finally, Mahuwe argues that ADES's failure to provide an interpreter constitutes national origin discrimination under Title VI of the Civil Rights Act of 1964. But Title VI prohibits only intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see* 42 U.S.C. § 2000d. Mahuwe does not allege that ADES intentionally discriminated against him, so his claim fails.

## B.    Mahuwe Qualifies for PUA Under the CARES Act Because He Had to Quit His Job as a Direct Result of COVID-19.

¶20    Mahuwe argues that he qualifies for PUA. Under the CARES Act, an applicant was eligible for PUA if the applicant (1) was ineligible for regular unemployment and (2) self-certified that he was "otherwise able to work and available for work . . . except [he was] unemployed, partially unemployed, or unable or unavailable to work" for one of 11 enumerated reasons. 15 U.S.C. § 9021(a)(3)(A)(i)–(ii). In his PUA application, Mahuwe stated he was "unable to reach [his] place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency." *See* 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ee).

¶21    Mahuwe was not eligible for PUA on this ground. As a rideshare driver, he "does not have a 'place of employment.'" U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20* I-6 (2021). He, therefore, cannot claim that he could not reach his place of employment. Mahuwe may, however, be eligible on other grounds. He argues he also qualifies because he had to "quit his . . . job as a direct result of COVID-19." *See* 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii).

¶22    Although Mahuwe did not select this subsection in his application, ADES concedes that it "did not limit [Mahuwe] to the

government-quarantine ground" during the hearing.[2] Because Mahuwe testified that he quit his job to avoid contracting COVID-19, he has properly preserved the issue for appeal.

¶23 As the appeals board found, Mahuwe stopped working because he was a vulnerable person trying to minimize his risk of infection to protect his health and life while awaiting a vaccination. Mahuwe has thus established that he "ha[d] to quit his job . . . as a direct result of COVID-19." He is, therefore, a covered individual under the CARES Act and is entitled to benefits. *See* 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii).

¶24 At the hearing, Mahuwe testified that starting on March 11, 2020, he took a two-week "vacation" to deal with an asthma-related illness. Shortly afterward, Uber sent its drivers an email recommending safe practices. Mahuwe felt compelled to stop driving because he was recovering from his "asthma attack" and COVID-19 could "catch [him] quick." He added that he was awaiting a vaccination, which would not be available until months later, and he would not feel safe returning to work without taking the added precautions.

¶25 The ALJ found that Mahuwe's reasons for quitting did not entitle him to benefits because he voluntarily stopped working because of his asthma and vaccination status. On appeal to the appeals board, Mahuwe argued that staying home complied with government orders because he was a vulnerable person.

¶26 The appeals board also rejected that argument, finding that the governor's order exempted employment and thus did not prevent Mahuwe from continuing to work. The board found that Mahuwe "chose to stop working as a ride-sharing driver because he is a vulnerable person and he wanted to wait until he was vaccinated before returning to work." The board also found that Mahuwe wanted to "minimize the risk of infection and protect his health" but that those were "not . . . reasons

---

[2]     Still, ADES argues that Mahuwe conceded or waived the argument when he stated to the appeals board, "I never quit the job. I still Uber partner until today my Uber driving account is still active." Considering Mahuwe's English language deficiencies, one could reasonably conclude that Mahuwe instead meant that he was prepared to return to work once it was safe. We need not speculate, however, because the appeals board found that he did "stop working."

identified in the CARES Act that allow[] for PUA benefits eligibility." The board thus affirmed.

¶27        Mahuwe argues that he qualifies under the direct-result subsection because he quit his job to avoid the "serious risk of contracting COVID-19." ADES counters that Mahuwe voluntarily chose to stop working because he had only general concerns about COVID-19, and thus he does not qualify.

¶28        Mahuwe is eligible if he can show he "ha[d] to quit . . . as a direct result of COVID-19." 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii). "Generally, an employee 'has to quit' within the meaning of [this subsection] only when ceasing employment is an involuntary decision compelled by" COVID-19. U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20, Change 4* I-7 (2021). Having only "general concerns about exposure to COVID-19" is not a qualifying reason under the CARES Act. U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20, Change 1* I-10 (2021).

¶29        In *Simmons v. Ariz. Dep't of Econ. Sec.*, we clarified that an applicant is eligible under this subsection if he "ha[d] to quit" because of an "unacceptable risk of exposure to the virus in the workplace." 254 Ariz. at 113, ¶ 20. The applicant in *Simmons* quit his job because his employer created "an amplified risk of exposure to COVID-19" by refusing to address the applicant's specific concerns, including sick employees in the office and the employer's lax mask policies. *Id.* We held that these were not general concerns and that the applicant was eligible for PUA. *Id.* at ¶¶ 19–20.

¶30        Like *Simmons*, Mahuwe identifies specific COVID-19-related reasons for quitting his job. He notes that his asthma and age increased his risk of suffering health complications or death from COVID-19. He identifies a recommendation from the Centers for Disease Control and Prevention that such people "should take special precautions" because of their heightened risk of serious illness. *See Coronavirus Disease 2019 (COVID-19) Situation Summary*, CDC (Mar. 17, 2020), https://www.stacks.cdc.gov/view/cdc/85916. He also supports this notion with a citation to a contemporaneous Arizona Department of Health Services news release, which explains that the "highest risk" individuals are "older adults and people with serious medical conditions like . . . lung disease." *Arizona to Receive More than $12 Million in Federal Funding to Support COVID-19 Response*, Ariz. Dep't of Health Servs. (Mar. 12, 2020), https://www.azdhs.gov/director/public-information-office/index.php#news-release-031220.

¶31　　　　Mahuwe also points to the executive orders issued during the pandemic, which sought to "protect [Arizona's] most vulnerable citizens" and informed them that "the elderly population and those with serious underlying health conditions are most at risk from COVID-19." Ariz. Exec. Order No. 2020-09 (Mar. 19, 2020); Ariz. Exec. Order No. 2020-07 (Mar. 11, 2020). And the governor advised "all vulnerable individuals, including the elderly and individuals with underlying health conditions, . . . to take reasonable steps to continue limiting their time away from [home]." Ariz. Exec. Order No. 2020-36 (May 12, 2020).

¶32　　　　Mahuwe repeatedly testified that he quit driving for Uber because of COVID-19. The ALJ did not question Mahuwe's credibility, and no contradictory evidence was offered. The ALJ thus erred by finding that Mahuwe quit simply because of general concerns about COVID-19. Instead, he quit because his age and a documented underlying medical condition made him a vulnerable person, his work environment in a car made it difficult to distance himself from or control others, and he was awaiting a vaccine. The uncontroverted evidence shows that he suffered lung problems causing him to take prescription medication for asthma. He quit his job in early 2020 when little was known about COVID-19, and no mask mandates were in effect. Mahuwe was compelled to stop driving due to concerns specific to his circumstances that the state and federal governments recognized as putting his life at risk. Had he continued to work, he would have subjected himself to "an unacceptable risk of exposure to the virus." *See Simmons*, 254 Ariz. at 113, ¶ 20. Mahuwe returned to work for Uber once he got vaccinated for COVID-19, further supporting his quitting directly because of COVID-19.

¶33　　　　Still, ADES contends Mahuwe failed to show that he "*had* to quit his job as a *direct* result of COVID-19." ADES argues that we should narrowly interpret "direct result" for several reasons. ADES first cites 15 U.S.C. § 9021(h), which provides that PUA eligibility requirements generally parallel the disaster unemployment assistance requirements in 20 C.F.R. § 625. And ADES notes that 20 C.F.R. § 625.5(c) limits unemployment as a "direct result" of a major disaster to unemployment that "is an immediate result of the major disaster itself, and not the result of a longer chain of events precipitated or exacerbated by the disaster." ADES then argues that Mahuwe's unemployment was not a "direct result" of COVID-19 because he could not show, for example, "that the pandemic had destroyed his car or that the government's stay-at-home order had forced his company to shut down."

¶34 This interpretation is far too narrow. First, we reiterate that we interpret the law broadly to grant benefits and narrowly to deny them. *Simmons*, 254 Ariz. at 111, ¶ 11. Second, the Department of Labor specifically provided an example of eligibility under the direct-result subsection that includes a "chain of events": an individual would be eligible under the direct-result subsection if he quits his job to care for his child who cannot attend school because the school is closed to in-person instruction as a direct result of the pandemic. U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20, Change 5* 10 (2021). Although Mahuwe's unemployment does not result from a similar "chain of events," this example shows that our interpretation of the PUA eligibility requirements should not be inseparably linked to the disaster unemployment assistance regulations.

¶35 ADES next argues that even if Mahuwe quit his job because of his age and lung disease, he is still not eligible for PUA because a vulnerable person is eligible "*only if*" a healthcare professional advised him to self-quarantine. An individual is indeed eligible if he "is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19." 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ff). But this subsection does not preclude eligibility on other grounds. ADES cites a Department of Labor letter for more support, but the letter states that "[w]ithout having been advised by a health care provider to self-quarantine, an individual who does not go to work due to general concerns about exposure to COVID-19, *and who does not meet any of the other COVID-related criteria for PUA*, is not eligible for PUA." U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20, Change 1* I-10 (2020) (emphasis added). The Department of Labor later clarified that states *must* allow applicants to self-certify their eligibility on more than one ground. U.S. Dep't of Labor, *Unemployment Insurance Program Letter No. 16-20, Change 5* 10 (2021). Mahuwe's ineligibility under the healthcare-provider subsection is irrelevant to his eligibility under the direct-result subsection.

¶36 Finally, ADES points to the email Uber sent its drivers that recommended they wear masks and drive with the windows open, among other safety suggestions. ADES argues that this email shows that Mahuwe did not have to quit. And as mentioned, the ALJ concluded that Mahuwe could have returned to work while wearing a mask. But Uber's email to all drivers did not account for the unique circumstances of any individual. Although many drivers could have taken precautions and continued to work, Mahuwe's circumstances compelled him to quit to avoid "an

unacceptable risk of exposure to the virus." *See Simmons*, 254 Ariz. at 113, ¶ 20.[3]

## CONCLUSION

**¶37** We reverse the appeals board's decision and remand for a determination of the amount of the benefit to award.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[3] Mahuwe argues that the ALJ erred by not gathering enough information to develop the record fully. He contends that under these circumstances, the ALJ should have further "probe[d] the relevant facts." We agree that "there are circumstances in which [an administrative body] may be required to take more than a passive role in the fact finding process." *Emp. Sec. Comm'n v. Doughty*, 13 Ariz. App. 494, 497 (1970). Such circumstances may be present here because ADES incorrectly allowed Mahuwe to select only one qualifying reason when completing the application for PUA benefits. Ultimately, however, we need not decide whether the ALJ erred by arguably failing to probe into facts rendering Mahuwe eligible for other reasons because we find that Mahuwe qualifies for PUA, having quit his job as a direct result of COVID-19.