IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KEEP KIDS SAFE, a Washington nonprofit, | No. 85329-5-I |
| Appellant, | DIVISION ONE |
| v. | |
| THE CITY OF KIRKLAND, a municipal government, acting through the KIRKLAND CITY COUNCIL, a Washington State Public Agency, | UNPUBLISHED OPINION |
| Defendants, | |
| KING COUNTY, a county government, | |
| Respondent. | |

SMITH, C.J. — In 2021, King County implemented Ordinance 19366 and adopted the "Health through Housing" plan, which set out steps for the County to follow when purchasing hotels to use as supportive housing for persons experiencing homelessness. In February 2023, Keep Kids Safe (KKS), a nonprofit made up of Kirkland community members, filed a complaint alleging that the County failed to comply with essential steps in the plan and moved for a preliminary injunction to block the repurposing of a former hotel. The County moved to dismiss and the trial court granted the County's motion and denied KKS's request for a preliminary injunction. On appeal, KKS argues that the ordinance and plan created an implied right of action, that KKS had standing as an injured party, and that the trial court abused its discretion in denying KKS's

request for a preliminary injunction.  We find these arguments unpersuasive and affirm.

FACTS

Early February 2021, in response to the homelessness crisis exacerbated by COVID-19,[1] King County adopted Ordinance 19236 (Ordinance).[2]  The Ordinance authorized the County to impose a local sale and use tax to support affordable housing, behavioral health facilities, and other related services.  The Ordinance also directed the county executive to develop a "Health Through Housing Implementation Plan" (Plan) to govern spending of those tax proceeds.

The Plan proposed purchasing hotels to repurpose as permanent supportive housing for persons experiencing homelessness.  To address the housing crisis and aid those experiencing chronic homelessness, the County planned to acquire 12 sites by the end of 2021.  The County's Department of Community and Human Services (DCHS) consulted with local city governments to select sites.  By August 2021, the County had already closed on or entered into purchase and sale agreements for nine locations.  Only one site was on the east side of Lake Washington.

The Plan assumed that by January 2022, the County would acquire three more sites.  It recognized, however, the potential need for further acquisitions

---

[1] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

[2] King County Ordinance 19236 (Feb. 19, 2021) (Ordinance), codified at King County Code 24.30.020 [https://perma.cc/K5VF-TWEM].

after 2021.  The Plan detailed an eight-step process that the County had to follow when purchasing any additional properties.  The siting process required a partnership with a willing city, consultations with County and city staff, an equity and social justice impact review, and at least one public meeting to incorporate feedback before the County could close on the purchase of an appropriate building.  The County Council officially adopted the Plan in December 2021.[3]

### Kirkland La Quinta Inn

Late February 2021, the City of Kirkland informed the County that it would be willing to host a site.  A few months later, the County and City began working together to find an appropriate location and eventually decided on a La Quinta Inn.  In choosing the La Quinta Inn, as with other sites, the City and County considered its proximity to community resources serving children and families including daycares and schools.

The acquisition proved more complicated than any of the prior locations, as the seller made numerous demands for changes to the purchase and sale agreement (PSA).  So, although the County intended to purchase all 12 locations by the end of 2021, the La Quinta PSA was not executed until January 2022.  Because the agreement was not finalized until 2022, the Plan's requirements for new acquisitions applied.

While in the process of ironing out the details of the PSA, the County and City reached out to the local community for input and comments.  In February

---

[3] King County Ordinance 19366 (Dec. 7, 2021), officially adopted and approved the initial Health through Housing Implementation Plan.

3

2022, the City announced that the County was conducting due diligence on the La Quinta Property. Later that same month, the County and City took part in two separate meetings to answer questions about the property. First, the DCHS director, Kirkland's mayor, and city councilmembers attended a virtual meeting hosted by Eastside Preparatory School, one of the four schools adjacent to the La Quinta Inn. The meeting involved more than 200 virtual attendees. And second, county and city officials attended a regular public meeting of a local community council. The three-hour discussion included a presentation by the DCHS director and two hours of public comments and questions. The County officially closed on the property in March 2022, days after the second meeting.

<u>First Lawsuit</u>

In response to the County's progress on the site, a group of Kirkland parents and community members formed Keep Kids Safe ("KKS"), a non-profit with the purpose of "present[ing] their united concerns about the County's plan for the La Quinta." In March 2022, KKS initiated a lawsuit against King County seeking to block the repurposing of the La Quinta Inn. KKS alleged a violation of the Open Public Meetings Act[4] (OPMA) and sought declaratory relief. The County moved to dismiss on a number of grounds, including that the OPMA did not apply. The court granted the motion to dismiss without prejudice in April 2022.

---

[4] RCW 42.30.

Second Lawsuit

In February 2023, KKS initiated a second lawsuit against King County. This time, KKS alleged that the County violated the Ordinance by failing to comply with some of the Plan's siting steps. Three weeks later, KKS also moved for a preliminary injunction to stop "any further actions by the County in furtherance" of the intended use of the La Quinta site. The County again moved to dismiss the complaint, asserting that neither the Ordinance nor the Plan created an implied right of action and that, even if it had, KKS lacked standing. The County presented the same arguments in response to KKS's motion for preliminary injunction.

In April 2023, the court denied KKS's motion for preliminary injunction and granted the County's motion to dismiss.

KKS appeals.

ANALYSIS
Motion to Dismiss

We review an order granting a CR 12(b)(6) motion to dismiss de novo. Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 843, 347 P.3d 487 (2015). Under CR 12(b)(6), a complaint must be dismissed if it fails to "state a claim upon which relief can be granted." Dismissal is appropriate where "the plaintiff cannot prove any set of facts consistent with the complaint that would entitle the plaintiff to relief." Jackson, 186 Wn. App. at 843. We presume all facts alleged in the complaint to be true, but are not required to accept any legal

conclusions on appeal. Rodriquez v. Loudeye Corp., 144 Wn. App. 709, 717-18, 189 P.3d 168 (2008).

Here, KKS contends that the County's alleged violations of the Plan provide facts upon which relief can be granted. The County counters that the Ordinance does not create an implied right of action that allows KKS to sue at all. Additionally, the County asserts that even if an implied right of action exists, KKS does not have standing. The Ordinance does not create an implied right of action.

Legislative action may be the foundation of a judicial enforceable claim but only where it creates a private right of action. Bennett v. Hardy, 113 Wn.2d 912, 921, 784 P.2d 1258 (1990). An express right of action exists where the legislative act explicitly provides a private right to sue. P.E.L . v. Premera Blue Cross, 2 Wn. App 460, 117, 540 P.3d 105 (2023). An implied right of action exists where there is no express right but the legislative act implies a private right to sue. Bennett, 113 Wn.2d at 921. We use a three-part test to determine whether to imply a right of action: (1) "whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted," (2) "whether the legislative intent, explicitly or implicitly, supports creating or denying a remedy," and (3) "whether implying a remedy is consistent with the underlying purpose of the legislation." Bennett, 113 Wn.2d at 920-21 (quoting In re WPPS Sec. Litig., 823 F.2d 1349, 1353 (9th Cir. 1987)).

Here, the Ordinance is the legislative act. The Plan, while adopted by Ordinance 19366, was drafted by the county executive. Accordingly, we cannot

6

impute legislative intent to a document that the legislature did not craft.[5]  As KKS fails to establish any of the three Bennett factors, the Ordinance does not create a private right of action.

   a. *Plaintiff Within Class*

" 'We look to the language of the statute to ascertain whether the plaintiff is a member of the protected class.' "  Swank v. Valley Christian Sch., 188 Wn.2d 663, 676, 398 P.3d 1108 (2017) (quoting Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 475m 951 P.2d 749 (1998)).  A plaintiff does not qualify as a member of a protected class if the statute in question "benefits the general public rather than an identifiable class of persons."  Keodalah v. Allstate Ins. Co., 194 Wn.2d 339, 346, 449 P.3d 1040 (2019).

KKS argues that because the language of the Plan requires "consistent cooperation, clear communication and common cause" and the Equity and Social Justice Impact Review considers the positive and negative impacts on people who live and work near a potential site, KKS qualifies as a member of the

---

[5] Our holding on this point is dictated by the plain language of the three-part test in Bennett, which consistently references "the statute," "legislative intent," and the "underlying purpose of the legislation."  113 Wn.2d at 920-21.  Additionally, the court in Bennett "borrow[ed]" the three-part test used by federal courts in determining whether to imply a cause of action, and the U.S. Supreme Court has squarely held in applying that test that language in an executive pronouncement, such as a federal regulation or the Plan here, "may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."  Alexander v. Sandoval, 532 U.S. 275, 291, 121 S. Ct. 1511, 149 L. Ed. 2d. 517 (2001).  The Sandoval court added:  "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.  Agencies may play the sorcerer's apprentice but not the sorcerer himself."  Sandoval, 532 U.S. at 291.  Here too, the Plan cannot conjure up a cause of action that the Ordinance does not expressly or implicitly authorize.

protected class. The County contends that the Ordinance specifically defines the protected class as those experiencing or at risk of experiencing chronic homelessness and that nothing in the document stretches to cover clients or customers of nearby properties and businesses. As we look to the Ordinance, not the Plan, KKS is not within the protected class.

As the County points out, the Ordinance is explicit in who it intends to benefit: "households experiencing chronic homelessness or at risk of experiencing chronic homelessness." In fact, the Ordinance notes that the purpose of the Plan is to align the allocation of the sales and use tax proceeds with the goal of benefiting those discrete groups. KKS provides no evidence that any of its members are experiencing or at risk of experiencing chronic homelessness. It is therefore outside of the protected class.

KKS makes no attempt to argue that its members fall within that protected category, instead arguing that the Plan's language requiring cooperation and the impact review's consideration of people who live and work nearby serve to expand the protected class. This argument is unpersuasive both because the Plan is not a legislative document we can consider under the Bennett factors, and because to consider KKS a member of the protected class would enlarge the class far beyond the clear intent of the Ordinance. The first factor is not met if the statute benefits the general public. As KKS appears to acknowledge, the community input pieces of the siting decisions benefit the public at large. Even if we were to expand the protected class, KKS would fail to meet this first factor.

   *b. Legislative Intent*

In analyzing the second factor, we consider whether the legislature intended to create a right of recovery under the statute.  Swank, 188 Wn.2d at 677.  In doing so, "we 'can assume that the legislature is aware of the doctrine of implied statutory causes of action.' "  Swank, 188 Wn.2d at 677 (quoting Bennett, 113 Wn.2d at 919).  Legislative intent generally supports creating a remedy where the legislature shows concern about a "distinct harm" but provides no mechanism for enforcing the law addressing the issue.  Carter v. Dep't of Soc. & Health Servs., 26 Wn. App. 2d 299, 311, 526 P.3d 874 (2023).

KKS asserts that because the Plan mandates a siting procedure and provides an alleged right for the affected community members to participate, the legislature intended to create a private remedy to enforce that right.  The County argues that administrative procedural steps do not create a private right of participation and that nothing in the Plan or Ordinance suggests that the legislature intended to create a private right of action to enforce that procedure.  We consider only the Ordinance.

The Ordinance does state that the county executive must describe an approach for how community input would be incorporated into the siting review process and does not provide an enforcement mechanism.  It does not, however, suggest any concern for a distinct harm stemming from a lack of input.  This is a stark contrast to other caselaw imposing implied rights of actions.

In Bennett, the Washington Supreme Court held that where a statue prohibited age-based discrimination for employees between the ages of 40 and

9

70 but did not provide any method of redress, there was an implied right of action. 113 Wn.2d at 921. To do so, the court focused on the statute's clear intent to confront the problem of age discrimination by employers. Bennett, 113 Wn.2d at 921. The statute articulated a distinct harm but failed to provide an enforcement mechanism. Bennett, 113 Wn.2d at 921.

More recently, in Swank, the Washington Supreme Court held that a statute regulating how school sports programs address young athletes' concussions established an implied right of action. 188 Wn.2d at 676-77. Again, the court focused on the clear legislative concern for youth athlete concussions. The legislature was even more direct in establishing a distinct harm than in Bennett, noting that "concussions are 'one of the most commonly reported injuries,' " that " '[t]he risk of catastrophic injuries or death is significant when a concussion or head injury [is] not properly evaluated and managed," and that some affected youth athletes are " 'prematurely returned to play resulting in actual or potential physical injury or death.' " Swank, 188 Wn.2d at 677 (alterations in original) (quoting RCW 28A.600.190(1)(a), (c)). The court implied a right of action because, despite articulating these clear concerns, the statute did not provide a remedy.

The Ordinance at issue here is distinguishable. The Ordinance does not establish any distinct harm that would result if the county executive failed to describe the approach for involving community input in the siting review process. In fact, the sentence requiring the County to describe such an approach is the only reference to community involvement in the entirety of the Ordinance. Given

10

this lack of expression of concern regarding a distinct harm, legislative intent does not support creating a private remedy.

### c. Consistent with Underlying Purpose

This third factor "requires the court to consider if implying a cause of action is consistent with the purpose of the statute." Swank, 188 Wn.2d at 679.

KKS contends that if there is no private right of action, there is no point to the language in the Ordinance discussing community involvement. The County asserts that because the purpose of the Ordinance is to combat homelessness by providing more stable affordable housing, to allow private citizens to block or delay that housing runs contrary to the underlying purpose. We agree with the County.

The Ordinance states explicitly that its purpose is to "combat the intersecting crises of COVID-19, chronic homelessness, housing affordability and behavioral health disorder[s]" by "provid[ing] more stable affordable housing for those experiencing chronic homelessness." KKS argues that the "[c]ourt should not allow public officers and agencies to pay only lip service to the communities that they ostensibly serve," asserting that to ask for community input without a right of action is useless. But the Ordinance's reference to community input is minimal and open-ended. KKS implies that the Ordinance establishes a clear and defined right to community involvement. But rather, in a document full of very specific requirements, the Ordinance only mentions community input once and merely requires that the county executive describe an approach for how community input may be incorporated into the review process when siting

affordable housing. Per the Ordinance, the County and City provided two opportunities for community input. The Ordinance does not suggest that community input must result in a change before proceeding with the siting process.

And in arguing that omitting a private right of action is only "paying lip service" to the community the County serves, KKS disregards the fact that those experiencing or at risk of experiencing chronic homelessness are also a part of that community. In fact, the director of DCHS for the County specifically noted that "because a goal of permanent supportive housing is to integrate residents within their local community, several of the original nine [] sites are also in close proximity to institutions and community resources servicing children and families." The purpose of the Ordinance is to create stable affordable housing that helps integrate people into the community. Granting private parties the right to block or delay the process of building such housing is inconsistent with the Ordinance's purpose. KKS fails to establish that it is within the protected class, that the legislative intent implies an enforcement mechanism, and that implying a private right of action is consistent with the underlying purpose of the Ordinance.

The Ordinance does not create a private right of action and the trial court did not err in dismissing the suit.[6]

---

[6] KKS argued on appeal that it had standing as an injured party. As the Ordinance did not establish a private right of action, we decline to reach the issue of standing.

Preliminary Injunction

KKS also sought a preliminary injunction to prohibit any progress on the La Quinta site while this appeal was pending. Affirming the trial court's dismissal moots KKS's appeal from the denial of the preliminary injunction.

In general, a case is moot when the court can no longer provide meaningful relief. Global Tel*Link Corp. v. Dep't of Corr., 24 Wn. App. 2d 852, 856, 521 P.3d 250 (2022). A preliminary injunction serves to maintain the status quo until the trial court can conduct a hearing on the merits of the complaint. Nw. Gas Ass'n v. Wash. Util. and Transp. Comm'n., 141 Wn. App. 98, 115-16, 168 P.3d 443 (2007).

No preliminary injunction is needed to preserve the status quo during trial proceedings that are now over. We decline to reach the preliminary injunction and affirm.

Smith, C.J.

WE CONCUR:

Feldman, J.            Coburn, J.

13